FOURTH DIVISION
November 2, 2006

No. 1-05-2441


| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) | Appeal from |
| a Massachusetts Mutual Insurance | ) | the Circuit Court |
| Company, Individually and as Subrogee | ) | of Cook County. |
| of United Parcel Service, Inc., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HOME ASSURANCE COMPANY, INC., | ) | |
| a New York Stock Insurance Company, | ) | |
| and ST. PAUL MERCURY INSURANCE COMPANY, | ) | |
| a Minnesota Stock Insurance Company, | ) | Honorable |
| | ) | Anthony L. Young. |
| Defendants-Appellees. | ) | Judge Presiding. |


PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff Liberty Mutual Insurance Company (Liberty) appeals from an order of the circuit court of Cook County granting summary judgment in favor of defendant St. Paul Mercury Insurance Company (St. Paul) on Liberty's claims for equitable subrogation, prejudgment interest, and attorney fees and costs for vexatious and unreasonable delay under section 155 of the Illinois Insurance Code (Insurance Code) (215 ILCS 5/155)(West 2000)). Liberty also appeals from an order of the circuit court granting St. Paul's motion to strike a letter that was an exhibit to

No. 1-05-2441

Liberty's reply brief and all references thereto in the reply brief.

On appeal, Liberty contends that: (1) Liberty proved each element of its claim for equitable subrogation as a matter of law; (2) St. Paul's "abandoned and unused materials" exclusion did not apply; (3) the doctrine of "mend the hold" barred St. Paul from asserting that the "abandoned and unused materials" exclusion applied; (4) the circuit court erred by striking the "St. Paul settlement letter"; (5) there was no breach of the St. Paul policy; and (6) St. Paul is guilty of vexatious and unreasonable delay under section 155 of the Insurance Code. For the following reasons, we affirm.

I. BACKGROUND

A. The Underlying Lawsuit

On June 20, 2001, Dorothy Palcowski filed her first amended complaint, which alleged injuries sustained after she tripped and fell over protruding nails on a ramp, while working as a security guard at the United Parcel Service (UPS) facility located in Hodgkin, Illinois (UPS facility). Palcowski alleged that her injuries occurred on April 2, 2000. The complaint named UPS, Tarcom Corporation (Tarcom), and the ServiceMaster Company (ServiceMaster) as defendants. Palcowski's employer, Initial

-2-

Security, was named as a third-party defendant. UPS had subcontracted with Tarcom to perform construction work relating to building guardhouses at the UPS facility. UPS had also subcontracted with ServiceMaster to provide housekeeping at the facility.

 B.  UPS's Contract with Tarcom and St. Paul's Insurance Policy

UPS's contract with Tarcom for the guardhouse construction project was dated August 23, 1999. Pursuant to that contract, Tarcom was required to make UPS an additional insured on its commercial general liability (CGL) policy. The contract required that the completed operations coverage afforded by the CGL policy shall be effective for a period of two years after completion of the work.

Tarcom purchased a CGL policy from St. Paul (the St. Paul policy), which provided CGL limits of $1 million per occurrence. In a letter dated September 27, 2001, St. Paul acknowledged that UPS was an additional insured under the policy pursuant to the "Additional Protected Persons Endorsement." The "Additional Protected Persons Endorsement" of the St. Paul policy provides in pertinent part:

"This endorsement changes your Contractor Commercial General Liability Protection.

No. 1-05-2441

How Coverage Is Changed

There are two changes which are described below.

1.  The following is added to the Who Is Protected
    Under This Agreement section.  This change adds
    certain protected persons and limits their
    protection.

    **Additional protected person**.  The person or
    organization named below is an additional
    protected person as required by a contract or
    agreement entered into by you.  But only for
    covered injury or damage arising out of:

    •    your work for that person or organization;

    •    your completed work for that person or
         organization if your contract or agreement
         requires such coverage;

    •    premises you own, rent, or lease from that
         person or organization; or

    •    your maintenance, operation, or use of
         equipment leased from that person or
         organization.

    We explain what we mean by your work and your
    completed work in the Products and completed work
    total limit section.

***

**Other Terms**

All other terms of your policy remain the same.

**Person Or Organization:**

Any person or organization which a Named Insured has by written contractual agreement executed prior to an occurrence or accident agreed to name as an additional insured.

*Your completed work* means your work that is completed at the earliest of the following times, including work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete:

- When all of the work called for in your contract has been completed.

- When all of the work to be done at the work site has been completed, if your contract calls for work at more than one site.

- When that part of the work at the work site has been put to its intended use by any person or organization, other than another contractor or subcontractor working on the same project.

But we won't consider the following to be your

completed work:

- Uninstalled equipment, abandoned or unused materials, or tools.

***

*Your work* means:

- any work that you're performing or others are performing for you; or
- any service that you're providing or others are providing for you."

C. Defense and Settlement of the Underlying Lawsuit

After Palcowski filed her first amended complaint, UPS sent identical letters to St. Paul, Zurich American Insurance Company (Zurich), and American Home Assurance Company (American Home or AIG). UPS was named an additional insured on the insurance policy issued by Zurich pursuant to UPS's contract with ServiceMaster for maintenance services at the UPS facility. UPS was also an additional insured on the insurance policy issued by American Home pursuant to UPS's contract with Initial Security for security guard services at the UPS facility. In its letters to St. Paul, Zurich, and American Home, UPS elected each of the three policies to provide exclusive defense and indemnification to UPS, to the exclusion of UPS's own policy with Liberty. St. Paul agreed to defend UPS, but subject to a reservation of rights

with respect to indemnification. Zurich and American Home did not offer to defend UPS.

On January 8, 2003, Palcowski reached a settlement agreement with UPS for $270,000, and the underlying lawsuit was dismissed on January 9, 2003. The settlement funds were apportioned among the defendants as follows: $235,000 was allocated to extinguish the liability of UPS ($215,000 paid by Liberty and $20,000 paid by Zurich); $17,500 to extinguish the liability of ServiceMaster (paid by Zurich); and $17,500 to extinguish the liability of Tarcom (attributable to Tarcom's potential liability only).

D. The Present Declaratory Judgment Action

On May 20, 2002, UPS and Liberty filed a complaint for declaratory judgment against Zurich and American Home, seeking to secure coverage under those policies. St. Paul was defending UPS in the underlying lawsuit under a reservation of rights and was not named in the complaint. On October 31, 2002, American Home filed a motion for summary judgment with respect to Liberty's claims. In exchange for Zurich's payment of $20,000 on behalf of UPS in the underlying settlement, Zurich was dismissed from the present declaratory judgment action in an agreed order dated February 7, 2003. The agreed order also indicated that Zurich's policy was "deselected."

No. 1-05-2441

On February 7, 2003, Liberty filed an amended complaint for declaratory judgment against St. Paul and American Home, asserting claims for equitable subrogation and damages under section 155 of the Illinois Insurance Code for vexatious and unreasonable delay in settling the underlying suit and reimbursing Liberty. Liberty's amended complaint also dropped UPS as a plaintiff and Zurich as a defendant.

St. Paul and American Home filed answers to Liberty's amended complaint. St. Paul also filed a cross-claim against American Home and a third-party claim against Zurich, seeking equitable contribution from both insurers in the event that St. Paul was found liable to Liberty.

E. The Cross-Motions for Summary Judgment

On August 2, 2004, Liberty filed a cross-motion for summary judgment with respect to its claims against American Home and a motion for summary judgment with respect to its claims against St. Paul. Liberty subsequently settled its claims against American Home and the circuit court granted American Home's motion to dismiss all claims against it on July 15, 2005. American Home takes no part in this appeal.

On June 14, 2005, St. Paul filed a response to Liberty's motion for summary judgment and a cross-motion for summary

judgment against Liberty.  In its combined response and cross-motion for summary judgment, St. Paul argued that it had no indemnity obligation to UPS where: (1) St. Paul's policy exclusion for "abandoned and unused materials" applied, and (2) UPS breached St. Paul's policy conditions by deselecting or deactivating the Zurich policy, thereby eliminating St. Paul's right to equitable contribution from Zurich.  St. Paul also moved for summary judgment with respect to Liberty's claim under section 155 of the Insurance Code.

On June 28, 2005, Liberty filed a reply memorandum in support of its motion for summary judgment against St. Paul.  In its reply, Liberty argued that the doctrine of "mend the hold" barred St. Paul from asserting, for the first time in its response to Liberty's motion for summary judgment, that the "abandoned and unused materials" exclusion of its policy applied in this case.  Liberty argued that St. Paul failed to raise the exclusion in its reservation of rights letter, its answer to the amended complaint for declaratory judgment, or in its settlement offer letter sent by St. Paul's counsel to Liberty's counsel on November 11, 2004.  Liberty attached the St. Paul settlement offer letter to its reply memorandum.  In its reply, Liberty also argued that St. Paul's exclusion did not apply, that UPS did not breach the St. Paul policy conditions, and that St. Paul owed

damages and attorney fees under section 155 of the Insurance Code. Liberty also filed a separate motion for summary judgment on the section 155 claim.

On July 8, 2005, St. Paul filed a motion to strike portions of Liberty's reply memorandum, including the settlement offer letter sent by St. Paul's counsel to Liberty's counsel on November 11, 2004. St. Paul argued that the letter was a confidential offer of settlement and that the parties had agreed that it would not be disclosed. On July 8, 2005, St. Paul also filed a reply memorandum in support of its cross-motion for summary judgment and a memorandum in opposition to Liberty's motion for summary judgment on the section 155 claim.

On July 11, 2005, Liberty filed a response to St. Paul's motion to strike portions of Liberty's reply memorandum. Liberty argued that the St. Paul settlement letter was admissible because it contained a statement of St. Paul's coverage position, an offer of settlement, and the settlement offer itself was redacted. Liberty asserted that the letter was therefore relevant to Liberty's "mend the hold" argument and Liberty's section 155 claim. Liberty also denied that it ever agreed to withhold the letter from the court.

On July 15, 2005, the circuit court denied Liberty's motion for summary judgment and granted St. Paul's motion for summary

judgment and entered judgment in favor of St. Paul. The circuit court stated: "I think this case hinges on the language of the policy. I think the ramp in question was abandoned by St. Paul's insured, and I don't think the mend the hold doctrine applies here because the reservation of rights letter, I think, is close enough to point you in the right direction."

On July 22, 2005, the circuit court allowed St. Paul's motion to strike the settlement letter and references to the letter in Liberty's reply memorandum. Liberty now appeals from the circuit court's orders.

## II. ANALYSIS

Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Home Insurance Co. v. Cincinnati Insurance Co., 213 Ill. 2d 307, 315 (2004); Connecticut Specialty Insurance Co. v. Loop Paper Recycling, Inc., 356 Ill. App. 3d 67, 71-2 (2005). We review the circuit court's grant of summary judgment de novo. Connecticut Specialty Insurance Co., 356 Ill. App. 3d at 72. We may also affirm the entry of summary judgment on any basis appearing in the record,

regardless of whether the circuit court relied upon that ground. Home Insurance Co., 213 Ill. 2d at 315.

A. Liberty's Claim for Equitable Subrogation

Liberty first contends that it established each and every element of its claim for equitable subrogation. The elements of an equitable subrogation claim are as follows: "(1) the defendant carrier must be primarily liable to the insured for a loss under a policy of insurance; (2) the plaintiff carrier must be secondarily liable to the insured for the *same loss* under its policy; and (3) the plaintiff carrier must have discharged its liability to the insured and at the same time extinguished the liability of the defendant carrier." (Emphasis in original.) Home Insurance Co., 213 Ill. 2d at 323. However, St. Paul maintains that it was not primarily liable to the insured because the St. Paul policy's completed work coverage for UPS was eliminated by the exclusion for "abandoned and unused materials." St. Paul asserts that the ramp that Palcowski fell on was abandoned by Tarcom when it finished its construction work at UPS, approximately three months prior to Palcowski's injury. We agree.

When construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the

parties as expressed in the agreement. <u>Connecticut Specialty Insurance Co.</u>, 356 Ill. App. 3d at 72. A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. If the words of a policy are clear and unambiguous, they must be afforded their plain, ordinary and popular meaning. <u>Connecticut Specialty Ins. Co.</u>, 356 Ill. App. 3d at 72-3.

The "Additional Protected Persons Endorsement" of the St. Paul policy provided coverage for UPS for Tarcom's "completed work." The St. Paul policy specifically excluded "uninstalled equipment, abandoned or unused materials, or tools" from its definition of "completed work." We find that none of the deposition testimony created a genuine issue of fact as to the application of the "abandoned materials" exclusion in this case.

Joel Hubbell testified at his deposition that he was the project engineer for UPS in charge of the guardhouse construction project until January 2, 2000. Hubbell testified that the purpose of the wooden ramps that Tarcom built during the guardhouse construction project was for a "temporary entrance into the building." Hubbell testified that "[w]e couldn't take people through the construction site, so that was the area that people used to get from the parking lot through the fence line

and into the building." Hubbell testified that he was not aware of any type of traffic involving maintenance vehicles using the ramps and that it "was not their purpose." Hubbell also testified that the removal of the wooden ramps that Tarcom built in conjunction with the guardhouse project would have been part of Tarcom's punch list and it would have been Tarcom's responsibility to remove any temporary ramps before it left the site. St. Paul's reply brief in support of its cross-motion for summary judgment against Liberty includes an exhibit entitled "UPS Guardhouses Punch List." The punch list includes instructions for Tarcom to "remove and clean up temp ramps, gates, fence etc." for both guardhouses constructed at the UPS facility.

Frank Kermend testified at his deposition that he was Tarcom's project superintendent at the UPS facility. Kermend testified that Tarcom built two temporary ramps near the guardhouses being constructed "for employees to get in through the parking lot to work." Kermend testified that Tarcom had completed its work and was no longer present at the UPS facility when Palcowski's injuries occurred. Kermend testified that the workers he supervised were gone from the UPS facility by February 2000. Kermend testified that Tarcom was responsible for removing temporary ramps and fencing that were part of the guardhouse

project. Kermend testified that at the time of Palcowski's injury, the ramp was not in the same position that Tarcom had placed it during construction of the guardhouse. Kermend testified that he remembered moving ramps pursuant to a punch list. While Kermend testified that he was asked to leave a ramp, he later testified he did not remember anyone from UPS instructing him to leave any of the temporary ramps at the site.

Glen Wyant testified at his deposition that he was project engineer for the UPS facility from January to April 2000. Wyant testified that the guardhouses were 99% complete at that time and that he would examine minor details a few times a week. Wyant testified that to the best of his knowledge, Tarcom installed the ramp in question in fall 1999, but did not know whether Tarcom was authorized by UPS to install it. Wyant testified that he did not recall seeing the ramp in question between January and April 2000. Wyant also testified that he did not recall when the ramp was removed or who ordered its removal. Wyant testified that the ramp Palcowski fell on was adjacent to a housekeeping entrance on the north side of a guardhouse. Wyant testified that Tarcom was not using the ramp for anything in April 2000. Wyant testified that the ramp had been in place since fall 1999, and that he believed that the ramp was placed at that entrance at ServiceMaster's request. Wyant testified that ServiceMaster used

the ramp for its tractor to haul garbage out to the parking lot.

Liberty argues on appeal that Tarcom was instructed to move the temporary ramp, upon which Palcowski was injured, to a permanent location at the UPS facility and that the ramp was therefore not abandoned by Tarcom.  However, in its motion for summary judgment, Liberty argued that "[i]t is undisputed that Palcowski tripped and fell over a nail protruding from a wooden ramp built by Tarcom, and which Tarcom was responsible for moving or discarding upon the completion of work."  We find that St. Paul was entitled to summary judgment on Liberty's subrogation claim where the evidence shows that Tarcom was responsible for removal of the ramp in question and the ramp left at the UPS facility falls within the "abandoned materials" exclusion.

Liberty cites <u>U.S. Sanitary Specialties Corp. v. Globe Indemnity Co.</u>, 204 F.2d 774 (7th Cir. 1953), in support of its argument that the "abandoned materials" exclusion does not apply where Tarcom was asked to move the ramp to a permanent location. However, we find Liberty's reliance on this case unconvincing. In <u>U.S. Sanitary Specialties Corp.</u>, the United States Court of Appeals for the Seventh Circuit considered whether an "abandoned or unused material" exception applied to exclude coverage.  In that case, a corporation's salesman demonstrated a floor wax by applying it to a small portion of the courthouse floor.  The

salesman failed to subsequently remove the wax, and on the day following the sale of wax to county officials, a third party slipped on the waxed spot and was injured. The court found that the wax used in the demonstration was not "abandoned," but was used and worked into a spot on the floor. The court found that the wax then "lost its identity" and became a glossy finish on the floor. The court noted that the "abandoned or unused material" exception referred "only to tools, equipment and materials which on completion of an operation should have been removed by the assured from the premises where the operation occurred but which, instead, were abandoned there by the insured and later were instrumental in causing an accident." U.S. Sanitary Specialties Corp., 204 F.2d at 777.

Unlike the wax in that case, here, the evidence showed that Tarcom built the temporary ramps in conjunction with the guardhouse project and was responsible for removing them after the project was completed and that Palcowski was injured upon one of the ramps that Tarcom failed to remove. Also, unlike the floor wax in U.S. Sanitary Specialties Corp., the ramp built by Tarcom did not "lose its identity" when it was used.

Liberty also argues that the St. Paul policy provided coverage in this case without regard to whether Tarcom or UPS was at fault. However, in this case, the St. Paul policy limited the

-17-

scope of coverage to Tarcom's "work" or "completed work." The St. Paul policy further provides that "completed work" does not include "abandoned or unused materials." As previously discussed, the evidence showed that the temporary ramp present at the UPS facility after Tarcom had completed its work was "abandoned" and therefore not covered by the St. Paul policy. Accordingly, Liberty's argument relating to the fault of Tarcom and UPS is inapposite.

### B. The "Mend the Hold" Doctrine

Liberty next contends that the doctrine of "mend the hold" barred St. Paul from asserting, for the first time in its response to Liberty's motion for summary judgment, that the ramp at issue fell within the "abandoned and unused materials" exclusion of the policy. The "mend the hold" doctrine has been referred to in the following terms: "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration. He is not permitted thus to amend his hold. He is estopped from doing it by a settled principle of law." Trossman v. Philipsborn, No. 1-04-0588 (August 21, 2006), citing County of Schuyler v. Missouri Bridge & Iron Co., 256 Ill. 348, 353 (1912); see also Gibson v. Brown, 214 Ill. 330, 341 (1905);

<u>Townsend v. Postal Benefit Ass'n of Illinois</u>, 262 Ill. App. 483, 489 (1931).

We find that the "mend the hold" doctrine is inapplicable in this case for the following two reasons. First, cases in which courts have applied the doctrine involve situations in which the offending party changed the initial reason for not performing a contract to a completely different reason during litigation. See <u>Smith v. Union Automobile Indemnity Co.</u>, 323 Ill. App. 3d 741, 746 (2001), discussing <u>Larson v. Johnson</u>, 1 Ill. App. 2d 36, 38-39 (1953). In <u>Larson</u>, the defendant initially relied upon the defense that the contract at issue had been procured through connivance, fraud, and misrepresentation. Later, the defendant altered its position and argued that a lease provision in the contract was indefinite and therefore unenforceable. <u>Larson</u>, 1 Ill. App. 2d at 38-39.

In the insurance context, courts have precluded insurers from denying a claim on one basis and then changing the basis for denial during litigation. In <u>Coulter v. American Employers' Insurance Co.</u>, 333 Ill. App. 631 (1948), the court declined to consider the defendant insurer's argument that the insured failed to give proper notice of an accident when it had previously based its denial of coverage solely upon the contention that the accident at issue was outside the scope of the policy's coverage.

Coulter, 333 Ill. App. at 634.  In Townsend, the defendant initially claimed that the plaintiff was not a member of the insured group at the time of her death but later asserted failure to give proper notice of the insured's death as a completely different defense.  The court barred the defendant from asserting the latter defense.

In this case, St. Paul's coverage position has been consistent.  Unlike the insurers in the cases cited by Liberty, St. Paul never completely changed its position.  On September 27, 2001, St. Paul issued a reservation of rights letter to UPS in which it agreed to defendant UPS in the underlying action, but St. Paul also specifically reserved the right to disclaim coverage.  St. Paul stated:

> "[S]ome of the claims made and damages sought are not covered by this policy.  The St. Paul [policy] affords coverage to [UPS] as an additional insured for injury or damage arising out of Tarcom's work.  If it is determined that the injuries sustained by plaintiff did not arise out of the work of Tarcom Corp. but rather another subcontractor, St. Paul disclaims any obligation to indemnify on behalf of [UPS]."

St. Paul's letter then directed UPS to the "Additional Protected Persons Endorsement" of the St. Paul policy and included the

-20-

provisions of that endorsement in the letter, including the definitions of Tarsom's "work," "completed work," and exclusion for "abandoned or unused materials."

Also, St. Paul's answer to Liberty's complaint contains the affirmative defense that the St. Paul policy does not indemnify Liberty for damages that did not arise out of Tarcom's work and that Liberty's claims are barred because it suffered no loss within the provisions of the St. Paul policy. At all times, Liberty was aware that St. Paul was relying on the provisions of its policy to exclude coverage for claims that did not fall within those provisions, specifically within the provisions relating to Tarcom's work. St. Paul did not switch positions in the middle of litigation; therefore, the "mend the hold" doctrine does not apply in this situation.

Second, Liberty has not demonstrated that it was surprised or prejudiced in any way by St. Paul's assertion that Palcowski's damages did not arise out of Tarcom's work or completed work but, rather, that the ramp fell under the "abandoned or unused materials" exclusion of the policy. This court has refused to apply the doctrine in the absence of unfair surprise or arbitrariness. See Trossman, slip op. at ____, citing Smith, 323 Ill. App. 3d at 746-47; William J. Templeman Co. v. United States Fidelity & Guaranty Co., 317 Ill. App. 3d 764, 771-72 (2000). We

-21-

therefore conclude that the circuit court properly declined to apply the "mend the hold" doctrine in this case.

C.  The St. Paul Settlement Letter

Liberty next contends that the circuit court erred by striking the settlement offer letter sent by St. Paul's counsel to Liberty's counsel on November 11, 2004.  Liberty argues that it redacted portions of the letter containing any settlement offer and that the remainder of the letter contained a straightforward statement of St. Paul's coverage position, which was offered to show that it was inconsistent with St. Paul's later claim that the "abandoned or unused materials" exclusion applied in this case.

The admissibility of evidence is within the sound discretion of the circuit court and will not be reversed absent clear abuse. Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 92 (1995).  Evidentiary rulings will not be reversed unless the error was substantially prejudicial and affected the outcome of the trial.  Jackson v. Pellerano, 210 Ill. App. 3d 464, 471 (1991).

As a general rule, matters concerning settlements and negotiations are not admissible.  Garcez v. Michel, 282 Ill. App. 3d 346, 348-49 (1996).  Illinois courts cite two primary concerns

-22-

in prohibiting the admission of such evidence: (1) an agreement to settle does not constitute an admission of guilt and is therefore irrelevant; and (2) admitting evidence of settlements and negotiations would contravene public policy by discouraging litigants from settling before trial. Garcez, 282 Ill. App. 3d at 349.

Liberty cites Quinlan v. Stouffe, 355 Ill. App. 3d 830 (2005), and Stathis v. Geldermann Securities, Inc., 295 Ill. App. 3d 844 (1998), in support of its argument that the settlement letter was admissible in this case. We find Liberty's reliance on those cases unavailing. In Quinlan, this court found the defendants' testimony concerning a settlement meeting to be admissible where the testimony contained no offer of settlement, was not related to either party's admission of guilt, and would not discourage any future out-of-court settlement. This court noted that the testimony directly related to the issue of whether the parties had formed a valid oral contract, and if so, the relevant terms of the contract. Quinlan, 355 Ill. App. 3d at 837.

In this case, the settlement letter sent by St. Paul's counsel to Liberty's counsel stated: "In light of the fact that this declaratory judgment action has been pending since May 9, 2002 with no clear end in sight, St. Paul offers the following in

full settlement of this case.  St. Paul makes this offer under the express understanding that neither you nor your clients will share the contents of these negotiations with any other defendant in this litigation or their counsel."  While the copy of this letter contained in the record has certain portions of the exact monetary settlement offer redacted, the letter contains a discussion of St. Paul's reasons for making such settlement offer, including an analysis of the parties' liabilities.  Unlike Quinlan, this letter contains an offer of settlement and a discussion of the reasoning behind that offer.  Admission of the letter would raise the exact concerns behind the general rule of inadmissibility, by discouraging litigants from settling before trial.

In Stathis, this court found no abuse of discretion where the circuit court permitted testimony regarding the parties' negotiations to show that the plaintiff subsequently changed his position and prior testimony on the same issue had already been presented by the plaintiff's son.  This court noted that while offers of compromise or settlement are generally inadmissible, "[s]tatements otherwise made by a party or on his behalf during the course of negotiations, which are inconsistent with the party's present position, however, may be introduced in evidence against him."  Stathis, 295 Ill. App. 3d at 861.  Liberty

-24-

maintains that the settlement letter was admissible to show that St. Paul's coverage position in the letter was inconsistent with its later position that the "abandoned or unused materials" exclusion applied, and to show the applicability of the "mend the hold" doctrine.  However, the letter states that "St. Paul offers the following in full settlement of this case," and does not set forth St. Paul's coverage position.  In addition, as previously discussed, Liberty has not shown that St. Paul's coverage position was inconsistent or that Liberty was surprised or prejudiced in any way by St. Paul's assertion that the "abandoned or unused materials" exclusion of the policy applied in this case.  Accordingly, we find no abuse of discretion in excluding this evidence.

D.  UPS's Deselection of the Zurich Policy

Liberty next contends that UPS did not breach any condition in the St. Paul policy by deselecting the Zurich policy.  Liberty has asserted that UPS deselected the Zurich policy upon Zurich's payment of $20,000 on behalf of liability attributable to UPS in the underlying lawsuit.  St. Paul argued before the circuit court, and maintains before this court, that the purported deselection was not proper and that if UPS did properly deselect Zurich, UPS breached the conditions of St. Paul's policy,

specifically the "Recovering Damages From A Third Party" clause, and Liberty is not entitled to any indemnity from St. Paul.

While this issue was fully briefed and argued before the circuit court, the court did not make any specific findings relating to this issue. Because, as previously discussed, St. Paul does not owe indemnity based on the language of the "Additional Protected Persons Endorsement," we need not address St. Paul's alternative argument.

### E. Costs and Attorney Fees

Liberty lastly contends that St. Paul litigated this case when it knew or ought to have known that it had no meritorious defense to coverage. Thus, Liberty argues that, pursuant to section 155 of the Insurance Code (215 ILCS 5/155 (West 2000)), it is entitled to reimbursement of attorney fees and sanctions against St. Paul. Section 155(1) of the Insurance Code provides:

"In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the

-26-

action reasonable attorney fees [and] other costs ***."
215 ILCS 5/155(1) (West 2000).

Liberty argues that St. Paul engaged in vexatious and unreasonable conduct in asserting its basis for coverage denial, making irrelevant discovery requests, and advancing frivolous coverage arguments.  However, where a *bona fide* dispute concerning coverage exists, costs and sanctions are inappropriate.  State Farm Mutual Automobile Insurance Co. v. Smith, 197 Ill. 2d 369, 380 (2001).  In this case, the circuit court determined that St. Paul correctly relied on the "abandoned or unused materials" exclusion in denying coverage.  We also determined that the exclusion was applicable in this case.  Therefore, we find that there existed a *bona fide* dispute concerning St. Paul's potential coverage.  Accordingly, costs and sanctions are inappropriate in this case.

### III. Conclusion

For the above-stated reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

NEVILLE and MURPHY, JJ., concur.