NO. 4-06-0147     Filed: 12/15/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

GRINNELL MUTUAL REINSURANCE COMPANY,  )  Appeal from
        Plaintiff-Appellee,          )  Circuit Court of
        v.                           )  Logan County
GRANT LaFORGE,                   )  No. 03MR29
        Defendant-Appellant.        )
        and                       )
COUNTRY COMPANIES MUTUAL INSURANCE &amp;  )
FINANCIAL SERVICES, as Subrogee of   )
ALAN INVESTMENTS; ALAN INVESTMENTS;  )  Honorable
and CROSS FARMS, INC.,            )  David L. Coogan,
        Defendants.             )  Judge Presiding.

_____

      PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

      In April 2003, defendant, Country Companies Mutual Insurance & Financial Services (which was then plaintiff and subrogee of defendants Alan Investments and Cross Farms, Inc.), filed a complaint against defendant, Grant LaForge, seeking to recoup $34,103.50 that Country Mutual paid to Alan Investments and Cross Farms for the loss of several hundred pigs that died while in LaForge's care.  In May 2003, plaintiff, Grinnell Mutual Reinsurance Company, filed a complaint for declaratory judgment, seeking a determination as to whether it owed its insured, LaForge, a defense in the underlying complaint.  In January 2006, the trial court granted summary judgment in Grinnell's favor.

      LaForge appeals, arguing that the trial court erred by granting summary judgment in Grinnell's favor because (1) Grinnell was estopped from asserting any coverage defenses under

the policy issued to LaForge because it failed to timely file its declaratory-judgment complaint, (2) Grinnell's declaratory-judgment complaint improperly sought a determination of non-liability for its past conduct, and (3) the "mend-the-hold" doctrine barred Grinnell from asserting the "custom[-]farming" exclusion set forth in the policy issued to LaForge.  We disagree and affirm.

## I. BACKGROUND

The following facts were gleaned from Country Mutual's underlying complaint, Grinnell's declaratory-judgment complaint, attached documents and exhibits, and certain stipulations of the parties.

Effective March 30, 2002, Grinnell issued a "farm[-]guard" insurance policy to LaForge.  The policy provided in pertinent part, as follows:

> "'We' will pay[,] subject to the liability limits shown for LIABILITY TO PUBLIC COVERAGE and the terms of the policy[,] all sums arising out of any one loss which any 'insured person' becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' covered by this policy.
>
> If a claim is made or suit is brought against any 'insured person' for liability covered by this policy, 'we' will defend the 'insured person.'  'We' will use 'our' lawyers and bear the expense.

- 2 -

HOWEVER, 'WE' WILL NOT DEFEND ANY SUIT AFTER 'OUR' LIMIT OF LIABILITY FOR THIS COVERAGE HAS BEEN PAID.  'WE' WILL DEFEND OR SETTLE ONLY IF COVERAGE EXISTS UNDER THE TERMS OF THIS POLICY."  (Emphasis added.)

In August 2000, Gary Cross, owner of Alan Investments, entered into an oral agreement with LaForge, under which LaForge agreed to care for Cross's pigs at LaForge's farm for a fee.  In April 2002, Cross delivered several hundred of his pigs to LaForge's farm, where LaForge was to feed and care for them.

On May 28, 2002, Ameren CIPS turned off the electricity at LaForge's farm due to LaForge's alleged failure to pay his power bill.  As a result, approximately 700 of Cross's pigs died.

In a June 14, 2002, letter to Alan Investments, Grinnell informed Cross that (1) it had received notice that Cross had sustained a loss in May 2002, (2) it had completed its investigation regarding his loss, and (3) LaForge's farm-guard policy did not provide coverage for the loss.

In a June 25, 2002, letter to LaForge, Grinnell informed him that (1) it had been investigating the May 2002 incident; (2) it was unable to provide coverage under LaForge's farm-guard policy because the policy "was not intended to cover the animals in [LaForge's] care" that belonged to Cross; (3) by advising LaForge of the reason for denying coverage, it did "not intend to waive the right to rely on other reasons that may become apparent at a later date"; and (4) if LaForge was sued as a result of the loss, he should contact Grinnell immediately.  In

denying coverage, Grinnell cited the following policy exclusions:

"UNDER LIABILITY TO PUBLIC--COVERAGE A

* * *

5.  'We' do not cover 'property damage' to property rented to, leased to, occupied by, used by, or in the care, custody[,] or control of any 'insured person' or any persons living in the household of an 'insured person.'

* * *

UNDER DAMAGE TO PROPERTY OF OTHERS--COVERAGE A-1

1.  'We' will not pay for 'property damage' to property owned by, leased to, or rented to any 'insured person' or any resident of 'your' household."

Attached to that letter was a copy of the June 14, 2002, letter from Grinnell to Alan Investments.

In a June 27, 2002, letter to LaForge, Cross Farms' attorney informed him that (1) due to LaForge's "fault" in the May 2002 incident, Cross Farms had suffered damages totaling $35,878; and (2) LaForge needed to pay that amount within seven days of receiving the letter.

In a July 9, 2002, letter to LaForge, Grinnell informed him that (1) the letter provided "additional information and clarification regarding coverage"; (2) LaForge's farm-guard policy did not provide coverage for his custom-farming opera-

- 4 -

tions; (3) as provided in paragraph 1 of exclusions "UNDER DAMAGE TO PROPERTY OF OTHERS--COVERAGE A-1," the policy did not cover property damage to "property owned by, leased to, or rented to any 'insured person'"; (4) by advising LaForge of the reasons for denying coverage, it did "not intend to waive the right to rely on other reasons that may become apparent at a later date"; and (5) if LaForge was sued as a result of the loss, he should contact Grinnell immediately. (The letter also indicated that, pursuant to the farm-guard policy, (1) "custom farming" means "any activity arising out of or in connection with" the care or raising of livestock, such as swine, "by any 'insured person' for any other person or organization in accordance with a written or oral agreement"; and (2) the policy did not cover property damage arising out of custom-farming operations of any insured person if the "'total gross receipts' from all 'custom farming' exceeds $2,000[] in [12] months of the prior calendar year.")

In a July 12, 2002, letter to the Illinois Department of Insurance, LaForge complained about Grinnell's denial of coverage. In a July 30, 2002, letter to the Department, Grinnell explained the results of its investigation and its reasons for denying coverage, including the farm-guard policy's custom-farming exclusion and paragraph 5 of exclusions "UNDER LIABILITY TO PUBLIC--COVERAGE A." As to the custom-farming exclusion, Grinnell noted that (1) since August 2000, LaForge had been caring for pigs owned by Cross, earning approximately $3,000 every other month; (2) LaForge had failed to pay his power bill, despite receiving a disconnection notice from Ameren CIPS (which

- 5 -

he did not open); and (3) Ameren CIPS shut off LaForge's electricity, resulting in the death of approximately 700 pigs.

On September 17, 2002, an insurance analyst for the Department sent a letter to LaForge, stating, in pertinent part, that "[t]he contract of insurance requires an insurance company to provide defense to the insured. I have directed a letter to [Grinnell] to respond directly to you which would state their defense of the claim representing the insured." That same date, the Department's insurance analyst sent a letter to Grinnell, which provided, in pertinent part, as follows:

"The Department has a question concerning [Grinnell's] contract obligation to defend the insured. The contract of insurance requires the company to provide defense to the named insured. Please direct a letter to the insured indicating this contract responsibility and photocopy that letter to this Department as soon as possible referring to file number 02-8085."

On September 23, 2002, Grinnell sent a letter to LaForge, clarifying that his farm-guard policy provided no coverage for the May 2002 loss because the claim "arose out of custom feeding of livestock." Grinnell also informed LaForge that if he was sued as a result of the loss, he should contact Grinnell as soon as possible and send Grinnell a copy of the lawsuit. Grinnell's legal department would then review the lawsuit and determine if it had an obligation to provide a defense.

- 6 -

On October 8, 2002, and October 21, 2002, LaForge sent letters to Grinnell, claiming that Grinnell had a duty to defend him and demanding coverage. In an October 28, 2002, letter to LaForge, Grinnell informed him that as stated in its prior correspondence and based on the information currently in its file, the policy did not provide coverage for the May 2002 loss. Grinnell again informed LaForge that if he was sued as a result of the loss, he should contact Grinnell immediately because "the allegations of the lawsuit may obligate us to provide you with a defense or pay your lawyer to defend you even though the policy does not provide any coverage."

On April 10, 2003, LaForge's counsel sent a letter to Grinnell, enclosing an April 1, 2003, letter from Country Mutual to LaForge, requesting a payment of $34,103.50 for the loss of the pigs.

On April 14, 2003, Country Mutual filed its complaint against LaForge, seeking to recoup $34,103.50 that it had paid to Alan Investments and Cross Farms for the loss of Cross's pigs. The complaint alleged, in part, that (1) LaForge and Alan Investments had entered into a verbal agreement, under which LaForge agreed to care for Cross's pigs for a fee; (2) Ameren CIPS shut off LaForge's electricity due to his failure to pay his power bill; and (3) as a result of the power shutoff, Alan Investments suffered property damage totaling $34,103.50. On April 17, 2003, LaForge's counsel sent a letter to Grinnell, enclosing a copy of the underlying complaint.

On May 12, 2003, Grinnell filed its declaratory-judg-

ment complaint, seeking a determination as to whether it owed LaForge a defense in the underlying action. Grinnell alleged, in pertinent part, that LaForge's farm-guard policy did not cover the May 2002 loss, citing the following policy exclusions: (1) the custom-farming exclusion; and (2) paragraph 5 of exclusions "UNDER LIABILITY TO PUBLIC--COVERAGE A," which states that the policy did "not cover 'property damage' to property rented to, leased to, occupied by, used by, or in the care, custody[,] OR control of any 'insured person' or any persons living in the household of an 'insured person.'"

In June 2003, LaForge filed an answer to Grinnell's declaratory-judgment complaint and six affirmative defenses, including the following: (1) the mend-the-hold doctrine barred Grinnell from asserting the farm-guard policy's custom-farming exclusion, and (2) under the doctrines of waiver and estoppel, Grinnell was foreclosed from seeking an adjudication of its obligations to LaForge because it failed to provide a defense when a claim was first made against him. LaForge also filed two counterclaims, seeking to recover for Grinnell's alleged breach of contract and bad faith.

In early December 2003, LaForge filed a motion for a default judgment. Five days later, Grinnell filed a motion requesting leave to file an answer to LaForge's counterclaims and affirmative defenses, which the trial court later granted.

Meanwhile, the underlying suit proceeded to trial. In mid-December 2003, a jury returned a verdict against LaForge and in favor of Country Mutual (damages totaling $26,603.50) and Alan

Investments (damages totaling $3,750). The jury also returned a verdict in favor of LaForge and against Cross on LaForge's counterclaim seeking to recover for the cost of feed and disposal of the dead pigs (damages totaling $5,059.20). LaForge appealed, and this court affirmed the trial court's judgment. Country Mutual Insurance Co. v. LaForge, No. 4-05-0235 (December 9, 2005) (unpublished order under Supreme Court Rule 23).

In January 2005, LaForge filed a motion for summary judgment, arguing that Grinnell's declaratory-judgment action improperly sought a determination of nonliability for its past conduct. In February 2005, Grinnell filed a summary-judgment motion, arguing that it was entitled to judgment as a matter of law based on the custom-farming and other policy exclusions, as well as LaForge's admissions regarding his care and feeding of Cross' pigs. The parties later filed briefs in the trial court and submitted several exhibits, including the farm-guard policy, copies of the correspondence between the parties and the Department, and pleadings in the underlying lawsuit. In August 2005, the court denied both parties' summary-judgment motions, upon determining that genuine issues of material fact existed.

In September 2005, Grinnell filed a motion requesting a bench trial. In December 2005, the parties agreed to file stipulations to be considered during a stipulated bench trial. In January 2006, the parties stipulated to the admission of several exhibits, including the following: (1) a copy of LaForge's farm-guard policy, (2) a copy of the April 2003 complaint in the underlying action, (3) copies of the correspondence

- 9 -

between the parties and the Department, (4) a transcript of the December 2004 trial in the underlying action, and (5) the verdict forms in the underlying action. The parties also stipulated to the following: (1) in December 2004, the jury returned a $30,353.50 judgment against LaForge in the underlying action; (2) in December 2005, this court affirmed the trial court's judgment in the underlying action (Country Mutual Insurance Co. v. LaForge, No. 4-05-0235 (December 9, 2005) (unpublished order under Supreme Court Rule 23)); (3) Grinnell and LaForge would stand on the briefs they had previously submitted to the trial court; (4) neither party forfeited any of their previously raised objections; and (5) if LaForge were called as a witness, his testimony would be consistent with his April 2005 declaration. LaForge's April 2005 declaration indicated, in pertinent part, as follows: (1) on May 28, 2002, LaForge was working in one of his fields when Ameren CIPS shut off his electricity; (2) no one from Ameren CIPS contacted him personally before doing so; (3) after learning that his electricity had been shut off, LaForge rushed to the hog-confinement building and discovered that a "substantial number" of pigs had died; (4) he did not know that Ameren CIPS was going to shut off his electricity; and (5) after the incident, he notified Grinnell that Cross had indicated that he was going to make a claim against LaForge.

Later in January 2006, the trial court sua sponte granted summary judgment in Grinnell's favor, upon determining that no genuine issue of material fact existed and Grinnell was entitled to judgment as a matter of law.

- 10 -

This appeal followed.

## II. ANALYSIS

### A. Procedural Posture

Initially, we note that the procedural posture of this case is unusual. Even though the trial court previously denied the parties' summary-judgment motions and the parties (1) agreed to a stipulated bench trial and (2) submitted stipulations, the court then <u>sua</u> <u>sponte</u> granted summary judgment in Grinnell's favor.

Because neither party challenges the trial court's authority to proceed as it did, we will review the court's ruling under the standard ordinarily applied to summary judgments--that is, <u>de</u> <u>novo</u>. <u>Peck v. Froehlich</u>, 367 Ill. App. 3d 225, 227-28, 853 N.E.2d 927, 931 (2006). "Summary judgment is proper if, and only if, the pleadings, depositions, admissions, affidavits and other relevant matters on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." <u>State Farm Mutual Automobile Insurance Co. v. Coe</u>, 367 Ill. App. 3d 604, 607, 855 N.E.2d 173, 176 (2006).

### B. The Timeliness of Grinnell's Declaratory-Judgment Complaint

#### 1. <u>The</u> <u>Duty</u> <u>To</u> <u>Timely</u> <u>File</u> <u>a</u> <u>Declaratory-Judgment</u> <u>Complaint</u>

LaForge argues that Grinnell is estopped from asserting any defenses under the farm-guard policy because it failed to timely file its declaratory-judgment complaint. Grinnell responds that its declaratory-judgment complaint was timely because it was filed within 25 days of Grinnell's receipt of the underly-

- 11 -

ing complaint filed by Country Mutual. We agree with Grinnell.

Although neither party explicitly frames the argument in this way, this case turns on our determination as to when Grinnell's duty to defend was triggered. While LaForge contends that Grinnell's June 2002 notice of Cross Farms' claim against him triggered the duty to defend, Grinnell contends that its duty to defend was triggered by the April 2003 filing of Country Mutual's underlying complaint against LaForge.

In Illinois, a liability insurer in doubt over whether it has a duty to defend its insured "'cannot simply stand on the sidelines and wait until the tort action is completed before contesting the question of coverage.'" Central Mutual Insurance Co. v. Kammerling, 212 Ill. App. 3d 744, 749, 571 N.E.2d 806, 810 (1991), quoting Reis v. Aetna Casualty & Surety Co., 69 Ill. App. 3d 777, 782-83, 387 N.E.2d 700, 704 (1978). Instead, the insurer must defend its insured under a reservation of rights or seek a declaratory judgment that no coverage exists under its policy. State Farm Fire & Casualty Co. v. Martin, 186 Ill. 2d 367, 371, 710 N.E.2d 1228, 1230-31 (1999).

> "When an insurer fails to seek a declaratory judgment as to its obligations and rights in a timely manner or defend under a reservation of rights, it has breached its duty to defend. [Citation.] The most important factor in determining whether an insurer has breached its duty to defend is not the raw chronological delay in an insurer's fil-

- 12 -

ing a declaratory[-]judgment action, but whether the insurer waited until trial or settlement was imminent."  Aetna Casualty & Surety Co. v. O'Rourke Bros., Inc., 333 Ill. App. 3d 871, 880, 776 N.E.2d 588, 596 (2002).

Although LaForge cites several cases addressing an insurer's duty to timely file a declaratory-judgment action, he cites no case law (and we have found none) in which the insurer's duty to take such action was triggered prior to the initiation of a lawsuit.  See Martin, 186 Ill. 2d at 369, 710 N.E.2d at 1230 (holding that when a lawsuit has been filed against an insured, the insurer has a duty to either (1) seek, though not necessarily secure, a declaratory judgment or (2) proceed under a reservation of rights); Insurance Co. of the State of Pennsylvania v. Protective Insurance Co., 227 Ill. App. 3d 360, 367-68, 592 N.E.2d 117, 122 (1992) (concluding that the insurer's September 1988 declaratory-judgment action was not timely when the underlying complaint was filed in May 1986); Employers Insurance of Wausau v. Ehlco Liquidating Trust, 186 Ill. 2d 127, 139-42, 708 N.E.2d 1122, 1129-31 (1999) (reaffirming that a "suit" exists when a complaint is filed in a court of law and concluding that a suit had been filed triggering the insurer's duty to defend); Aetna Casualty, 333 Ill. App. 3d at 880-81, 776 N.E.2d at 596-97 (holding that the insurer breached its duty to defend when it filed its declaratory-judgment complaint 11 months after learning of the complaints being filed against its insured); Cincinnati Cos. v. West American Insurance Co., 183 Ill. 2d 317, 329-30, 701

- 13 -

N.E.2d 499, 505 (1998) (holding that (1) the insurer's duty to defend is triggered by "actual notice of the underlying suit" and (2) such notice includes knowledge that a cause of action has been filed and the complaint falls within or potentially within the scope of the policy coverage); West American Insurance Co. v. J.R. Construction Co., 334 Ill. App. 3d 75, 85, 777 N.E.2d 610, 619 (2002) ("'two requirements must be satisfied before an insurer's duty to defend arises:  (1) the action must be brought against an insured, and (2) the allegations of the complaint must disclose the potential of policy coverage.  [Citation.]'"), quoting Federal Insurance Co. v. Economy Fire & Casualty Co., 189 Ill. App. 3d 732, 735, 545 N.E.2d 541[, 544] (1989).

 2. The Terms "Claim" and "Suit" as Used in the Farm-Guard Policy

Although LaForge does not direct our attention to the language of the farm-guard policy, his estoppel argument can only succeed if the terms of the farm-guard policy itself impose a duty on Grinnell to file a declaratory-judgment action prior to a lawsuit being filed.

The pertinent language of the farm-guard policy pro-vides as follows:  "If a claim is made or suit is brought against any 'insured person' for liability covered by this policy, 'we' will defend the 'insured person'".

In Country Mutual Insurance Co. v. Livorsi Marine, Inc., 222 Ill. 2d 303, 311, ___ N.E.2d ___, ___ (2006), our supreme court discussed the interpretation of an insurance policy as follows:

"When construing the language of an

- 14 -

insurance policy, a court is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy. [Citation.] An insurance policy must be construed as a whole, giving effect to every provision. [Citation.] If the words used in the policy are unambiguous, they are given their plain, ordinary, and popular meaning. [Citation.] Although insurance policies are construed liberally in favor of coverage, this rule of construction comes into play only when the policy language is ambiguous."

Giving the language in the farm-guard policy its plain and ordinary meaning, we conclude that a claim and a suit are not equivalent. If those terms have identical meanings, the clause is redundant and thus offends the well-settled principle of contract construction that the provisions of a contract shall not be interpreted in a way that renders other provisions meaning- less. Atwood v. St. Paul Fire & Marine Insurance Co., 363 Ill. App. 3d 861, 864, 845 N.E.2d 68, 71 (2006). In addition, in ordinary usage, a "claim" can be considered a demand for some asserted right. See Merriam-Webster's Collegiate Dictionary 210 (10th ed. 2000) (defining "claim" as "a demand for something due or believed to be due"). On the other hand, a "suit" refers to a proceeding in a court of law that requires the filing of a complaint. Employers Insurance of Wasau, 186 Ill. 2d at 140, 708 N.E.2d at 1130; see also Katz Drug Co. v. Commercial Standard

<u>Insurance Co.</u>, 647 S.W.2d 831, 835 (Mo. App. 1983) (concluding that the words "claim" and "suit" in an insurance policy were not equivalent).

### 3. <u>Grinnell's</u> <u>Duty</u> <u>Under</u> <u>the</u> <u>Farm-Guard</u> <u>Policy</u>

Although the farm-guard policy imposes a duty to "defend" when <u>either</u> "a claim is made" or a "suit is brought," we hold that the assertion of a claim and the filing of a lawsuit do not trigger precisely the same duty. As the previous discussion shows, Illinois case law speaks only to the duty to defend that arises when a lawsuit has been filed, and we have found no case in which the insurer's duty to file a declaratory-judgment complaint was triggered prior to the initiation of a lawsuit. We acknowledge that when, as in this case, the language of the insurance policy clearly imposes a duty upon notice of a claim having been made, the insurer is obligated to take some action. However, whatever the parameters of that duty might be, it does not extend to the obligation to file a declaratory-judgment action. Instead, the insurer's duty to file a declaratory-judgment action (or, alternatively, to defend its insured under a reservation of rights) does not arise until a complaint has been filed against the insured.

Accordingly, we hold that Grinnell did not have a duty to file its declaratory-judgment action until after Country Mutual's lawsuit was filed. A mere 25 days after Country Mutual filed its underlying complaint, Grinnell did just that. We thus further conclude that Grinnell's declaratory-judgment complaint was not untimely filed so as to estop Grinnell from raising

- 16 -

policy defenses.

LaForge also argues that Grinnell's declaratory-judgment complaint improperly sought a determination of nonliability for its past conduct.  In light of our conclusion that Grinnell's declaratory-judgment complaint was timely filed, we need not address this argument.

### C. The Mend-the-Hold Doctrine

LaForge next argues that the mend-the-hold doctrine barred Grinnell from asserting that the May 2002 loss was not covered under the farm-guard policy's custom-farming exclusion. Specifically, he contends that because Grinnell did not assert the custom-farming exclusion in its initial correspondence (the June 14, 2002, letter to Alan Investments), it was barred from later asserting that exclusion.  We disagree.

In Gibson v. Brown, 214 Ill. 330, 341, 73 N.E. 578, 582 (1905), our supreme court first discussed the mend-the-hold doctrine, as follows:

> "'Where a party gives a reason for his con-
> duct and decision touching anything involved
> in a controversy, he cannot, after litigation
> has begun, change his ground and put his
> conduct upon another and a different consid-
> eration.  He is not permitted thus to amend
> his hold.  He is estopped from doing it by a
> settled principle of law.'  Ohio and Missis-
> sippi Railway Co. v. McCarthy, 96 U.S. 258[,
> 267-68, 24 L. Ed. 693, 696 (1877)]."

- 17 -

See also <u>Schuyler County v. Missouri Bridge & Iron Co.</u>, 256 Ill. 348, 353, 100 N.E. 239, 240 (1912) (citing <u>Gibson</u>); <u>Harbor Insurance Co. v. Continental Bank Corp.</u>, 922 F.2d 357, 363 (7th Cir. 1990) (in which the Seventh Circuit noted that the mend-the-hold doctrine precludes a "party who hokes up a phony defense to the performance of his contractual duties" from trying "on another defense for size" after the first defense fails).

In <u>Liberty Mutual Insurance Co. v. American Home Assurance Co.</u>, No. 1-05-2441, slip op. at 18 (November 2, 2006), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___, the First District recently discussed the mend-the-hold doctrine and noted that "[i]n the insurance context, courts have precluded insurers from denying a claim on one basis and then changing the basis for denial <u>during litigation</u>."  (Emphasis added.)  We agree with <u>Liberty Mutual</u> that in the insurance context, the mend-the-hold doctrine precludes insurers from denying a claim for one reason and then changing the reason for its denial in the midst of litigation.

In this case, Grinnell sent a June 14, 2002, letter to Alan Investments, informing Cross that LaForge's farm-guard policy did not provide coverage for the May 2002 loss.  On June 25, 2002, Grinnell sent its initial letter to LaForge, informing him that it was unable to provide coverage because the farm-guard policy "was not intended to cover the animals in [LaForge's] care" that belonged to Cross.  Although Grinnell did not assert the custom-farming exclusion, it explicitly reserved its right to assert additional bases for denying coverage.  In a July 9, 2002,

- 18 -

letter to LaForge, Grinnell first asserted the custom-farming exclusion. Clearly, Grinnell's assertion of this additional basis for denying coverage occurred long before Grinnell filed its May 12, 2003, declaratory-judgment complaint. We thus conclude that the mend-the-hold doctrine did not apply under the circumstances of this case.

Even if we were to accept LaForge's assertion that the mend-the-hold doctrine applies when an insurer changes the reason for denying coverage before litigation is initiated, the doctrine nonetheless does not apply in the absence of detriment to the party seeking its application, unfair surprise, or arbitrariness. See Trossman v. Philipsborn, No. 1-04-0588, slip op. at 35-36 (August 21, 2006), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___ (noting that courts have refused to apply the mend-the-hold doctrine out of equitable considerations; concluding that the counter-plaintiffs could not prevail under the doctrine because they failed to show detriment, unfair surprise, or arbitrariness); Liberty Mutual, No. 1-05-2441, slip op. at 20, ___ Ill. App. 3d at ___, ___ N.E.2d at ___ (discussing Trossman and noting that the First District had "refused to apply the doctrine in the absence of unfair surprise or arbitrariness").

In this case, LaForge did not show (nor does he argue on appeal) that Grinnell's assertion of the custom-farming exclusion in its July 9, 2002, letter to him was arbitrary, unfairly surprised him, or was detrimental to him. Indeed, LaForge could not establish unfair surprise or detriment, given that Grinnell asserted the custom-farming exclusion (1) within 1

- 19 -

1/2 months after the May 28, 2002, incident and (2) 9 months before Country Mutual filed the underlying complaint against LaForge.  Thus, the mend-the-hold doctrine did not apply in this case.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH and COOK, JJ., concur.