# Illinois Official Reports

## Appellate Court

---

*Illinois State Bar Ass'n Mutual Insurance Co. v. Brooks, Adams & Tarulis*,
2014 IL App (1st) 132608

---

| | |
|---|---|
| Appellate Court Caption | ILLINOIS STATE BAR ASSOCIATION MUTUAL INSURANCE COMPANY, Plaintiff-Appellee, v. BROOKS, ADAMS and TARULIS; DOUGLAS C. TIBBLE, STEVEN B. ADAMS, RICHARD J. TARULIS, DAVID G. WENTZ, DAVID N. SCHAFFER and TIMOTHY J. HOPPA, Defendants-Appellants. |
| District & No. | First District, Second Division, Docket No. 1-13-2608 |
| Filed | December 23, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-29610; the Hon. MaryAnne Mason and the Hon. Jean Prendergast Rooney, Judges, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Flaherty & Youngerman, P.C., of Chicago (Michael J. Flaherty and C. Corey S. Berman, of counsel), for appellants. |
| | Pretzel & Stouffer, Chtrd., of Chicago (Robert Marc Chemers and Peter G. Syregelas, of counsel), for appellee. |

JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Justices Pierce and Liu concurred in the judgment and opinion.


**OPINION**


¶ 1        The trial court granted rescission of two insurance policies based on an alleged misrepresentation in the application for the first policy. We hold that a misrepresentation in an initial application does not justify rescission of a renewal of the policy, where the insured made no misrepresentation in the application for renewal and neither the new policy nor the application for renewal incorporated the initial application for insurance. We also find that a client makes a claim against an attorney when the client requests relief from the attorney for alleged errors or misconduct. When a client made a claim against his attorney in November 2002, and filed a legal malpractice lawsuit based on the same misconduct in 2005, the attorney made no misrepresentation when he told a potential insurer, in December 2007, that no claims had been made against him within five years of the date of his application. We reverse the rescission of both insurance policies.


¶ 2                                 BACKGROUND
¶ 3        In 1999, Tango Music, LLC, hired attorney Douglas Tibble, a partner in McBride, Baker and Coles, to sue Deadquick Music, Inc., for breach of contract and fraud. Tibble filed a complaint against Deadquick in federal court. Deadquick moved to dismiss the complaint. The district court ordered Tango to respond by March 22, 2002. Tibble and Tango filed no response. On September 18, 2002, the district court dismissed the lawsuit for want of prosecution.
¶ 4        When Tango learned of the dismissal, it contacted Tibble and told him it would seek redress from him for his negligence in handling the lawsuit against Deadquick. Tango, through Tibble, moved for reconsideration of the order dismissing Tango's lawsuit against Deadquick. By order dated November 27, 2002, the district court denied the motion for reconsideration. On December 5, 2002, McBride, Baker and Coles notified their malpractice insurer, Continental Casualty Company, of Tango's claim against Tibble. Continental acknowledged receipt of the notice of Tango's claim. Continental noted that as of December 13, 2002, Tango had not sued Tibble or McBride, Baker and Coles. Tango eventually filed its lawsuit against Tibble and McBride, Baker and Coles for legal malpractice in March 2005.
¶ 5        Tibble left McBride, Baker and Coles and started his own practice, affiliated with the firm of Brooks, Adams and Tarulis (BAT), in 2003. Three of Tibble's clients complained to the Attorney Registration and Disciplinary Commission (ARDC) that Tibble neglected their files. On May 31, 2005, the ARDC filed a charge against Tibble, alleging that he neglected client files and failed to communicate with clients. Tibble reached an agreement with the ARDC in

which he accepted a 30-day suspension of his license in 2006 and he agreed to take other measures to correct the effects of his neglect.

¶ 6    BAT sought to change its malpractice insurance. In 2007, Tarulis obtained an application form from the Illinois State Bar Association Mutual Insurance Company (ISBA). To respond to the form, Tarulis asked all of the attorneys working with or for BAT, including Tibble, (1) "Are you aware of any circumstance or incident that may result in a claim or suit against you?" and (2) "In the past 5 years, have any disciplinary complaints, grievances or inquiries been made to any admin. agency, court, or the ARDC ***?" Tibble answered the first question, "None." To the second question, he reminded Tarulis about the 2006 ARDC proceeding. Tibble did not mention the Tango lawsuit, although that remained unresolved. In accord with the answers Tarulis received from BAT attorneys, on December 11, 2007, Tarulis submitted an application to the ISBA that included the following:

"21. a. During the past 5 years has any claim been made against: Applicant or a predecessor firm; any current member of Applicant or a predecessor firm; or, to your knowledge, any former member of Applicant or a predecessor firm?

___Yes  _X_No

21. b. Is any current member of Applicant aware of any circumstance or incident that may result in a claim or suit?  ___Yes  _X_No"

¶ 7    In the application, Tarulis informed the ISBA about the ARDC proceedings concerning Tibble and the resolution of those proceedings. Tarulis did not mention Tango's lawsuit against Tibble; he did not then know about the lawsuit.

¶ 8    The ISBA issued a malpractice insurance policy to BAT, providing coverage for claims made and reported between December 30, 2007, and December 30, 2008. On December 10, 2008, BAT submitted an application to the ISBA for renewal of the policy. The ISBA issued a second malpractice insurance policy to BAT to cover claims made and reported between December 30, 2008, and December 30, 2009.

¶ 9    On May 28, 2009, Matthew Caruso filed a complaint against Tibble and BAT for legal malpractice in their handling of the estate of Scott Hudson. Alma Hudson filed a separate complaint on a similar basis on June 16, 2009. On June 1, 2009, Christopher Stoller filed a complaint against BAT, Tarulis and other BAT partners for legal malpractice. BAT promptly notified the ISBA of all three lawsuits. The ISBA accepted the tender of the defenses subject to its reservation of the right to deny coverage.

¶ 10    On August 21, 2009, the ISBA filed the complaint that started the case presently on appeal before this court. The ISBA sought rescission of the policies it issued to BAT for both 2008 and 2009, based on BAT's response to question 21 in the application BAT sent to the ISBA in 2007.

¶ 11    The trial court held that BAT answered question 21 falsely because BAT did not inform the ISBA about the lawsuit Tango filed against Tibble in 2005. The court held a trial limited to the issue of whether the false answer materially affected the acceptance of the risk or the hazard the ISBA assumed in the policy. See 215 ILCS 5/154 (West 2006). The court did not permit BAT to introduce into evidence expert testimony about the custom and practice in the insurance industry concerning the determination of a claim's date. However, the court permitted BAT to enter into the record an offer of proof on the issue.

¶ 12    In the offer of proof, John Dore testified that he had 38 years of experience in the insurance industry, and he currently worked as an independent insurance producer and director of an insurance firm who consulted with other professionals on insurance and reinsurance. In Dore's opinion, within insurance industry usage, Tango made its claim against Tibble in November 2002, when it told Tibble it would seek redress for his mishandling of the claim against Deadquick. Because Tango made the claim against Tibble more than five years before BAT submitted its initial application to the ISBA, BAT correctly responded to question 21 on the application that no claim had been made against any of the affiliated attorneys within the five-year period before the date of the application.

¶ 13    The ISBA's only witness at trial, Bonnie Hill, testified that she managed underwriting for the ISBA. She admitted that the renewal application did not incorporate the initial application, and she did not know of any misstatements in BAT's application for renewal of its malpractice insurance. Although the ISBA presented the 2009 policy as an exhibit at trial, it did not present to the trial court the renewal application for the 2009 policy. The ISBA relied solely on the application, admitted into evidence, for the 2008 policy. Hill said she probably would not have offered BAT the insurance policy for 2008, at least not at the stated premium with coverage for Tibble, if she had known about the lawsuit Tango filed against Tibble.

¶ 14    Tibble testified that in his work for Tango, his medical condition contributed to his failure to docket filing dates and remember deadlines. He testified that doctors subsequently said that he recovered from his medical condition.

¶ 15    The trial court found that BAT's failure to mention Tango's suit against Tibble materially affected the acceptance of the risk of the hazard the ISBA assumed. The trial court entered a judgment granting the ISBA rescission of both the 2008 and 2009 policies. The court ordered the ISBA to refund to BAT the sums BAT paid for its premiums, and the court ordered BAT to reimburse the ISBA for all sums the ISBA paid toward defense of the three lawsuits filed against BAT in 2009. Subtracting the amount the ISBA owed BAT from the amount BAT owed the ISBA, the court held that BAT owed the ISBA $22,816.87. The court also awarded the ISBA costs totaling $2,061. BAT now appeals.

¶ 16                                    ANALYSIS

¶ 17    BAT argues on appeal that the trial court erred (1) when it rescinded the 2009 policy, because the ISBA presented no evidence of any misrepresentation in the application for that policy; (2) when it found that BAT made a material misrepresentation in the application for the 2008 policy and rescinded the 2008 policy; (3) when it excluded Dore's expert testimony concerning the alleged misrepresentation; (4) when it awarded the ISBA reimbursement of the amounts the ISBA spent on defense of the claims against BAT; and (5) when it awarded the ISBA costs. We address only the first two issues.

¶ 18                                    2009 Policy

¶ 19    BAT argues that the ISBA presented no evidence in support of its request for rescission of the 2009 policy. BAT bases its argument on section 154 of the Illinois Insurance Code (Code). 215 ILCS 5/154 (West 2006). Because BAT asks us to decide only an issue of statutory interpretation with no relevant facts in dispute, we review the trial court's rescission of the 2009 policy *de novo*. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003).

¶ 20    Public policy disfavors insurance forfeiture because "insurance serves important functions in contemporary society." *Bellmer v. Charter Security Life Insurance Co.*, 140 Ill. App. 3d 752, 755 (1986). In accord with this public policy, the Code limits the circumstances in which an insurer can defeat or avoid its obligations under an insurance contract. *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 166-67 (2004). Section 154 of the Code provides:

> "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance *** shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154 (West 2006).

¶ 21    In December 2008, BAT submitted to the ISBA a written application for the 2009 policy. Bonnie Hill, who underwrote the 2009 policy, admitted that she knew of no misrepresentation in the application for the 2009 policy. Although the ISBA presented to the trial court the application for the initial policy, covering 2008, the ISBA did not even show the trial court the renewal application for the 2009 policy.

¶ 22    Instead, the ISBA argued to the trial court that the alleged misrepresentation in the application for the 2008 policy infected the application for the 2009 policy, even though the 2009 policy and the application for the 2009 policy did not incorporate the representations from the application for the 2008 policy. We cannot reconcile the ISBA's argument with the words of the Code. Under the express words of the Code, "No misrepresentation *** in the negotiation for a policy of insurance *** shall defeat or avoid the policy *** unless such misrepresentation *** shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor." 215 ILCS 5/154 (West 2006).

¶ 23    The Code does not make a misrepresentation in one application nullify all subsequent contracts between the parties. 215 ILCS 5/154 (West 2006). We cannot add language to the Code to make one misrepresentation defeat all subsequent insurance contracts, when the insured made no misrepresentations in its applications for the subsequent insurance. See *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.*, 118 Ill. 2d 389, 402 (1987).

¶ 24    Because the ISBA showed no misrepresentation in the application for the 2009 policy, and it did not present any evidence concerning any other statutory grounds for avoiding the policy, the Code required the ISBA to honor its commitments to BAT under the 2009 policy. We reverse the judgment granting the ISBA rescission of the 2009 policy. Because the ISBA owed BAT a duty to defend BAT against malpractice claims made and reported in 2009, we also reverse the trial court's order requiring BAT to reimburse the ISBA for amounts the ISBA spent defending the three claims made in 2009. We further reverse the order directing the ISBA to refund to BAT the premiums BAT paid for the 2009 policy.

¶ 25                                      2008 Policy

¶ 26    The trial court found that BAT made a material misrepresentation in its application for the 2008 policy. The parties agree about the relevant facts. In November 2002, Tango first told

Tibble of its intention to seek redress from Tibble for his malpractice. Tibble promptly reported the claim to his insurer. Tango filed its malpractice lawsuit against Tibble in 2005. On the insurance application BAT sent to the ISBA on December 11, 2007, BAT answered "No" to the question, "During the past 5 years has any claim been made against *** any current member of Applicant?" BAT argues that it answered the question correctly, so that under the Code the court should not have granted the ISBA rescission of the 2008 policy. Because the parties ask us to decide only an issue of the interpretation of the insurance policy, the application for the policy, and the Code, we review the issue *de novo*. *A.D. Desmond Co. v. Jackson National Life Insurance Co.*, 223 Ill. App. 3d 616, 619 (1992).

¶ 27   We adopt the following statement of relevant principles from the *A.D. Desmond* court:

> "[I]f a provision in a policy is ambiguous it will be construed in favor of the insured [citation] and against the insurer as drafter [citation]. A contract will be considered ambiguous if it is susceptible to more than one reasonable meaning. [Citation.] A provision in an insurance policy may appear clear on its face and yet contain latent ambiguity. [Citation.] To determine the existence of ambiguity in an insurance policy the court must examine the entire policy and construe pertinent parts in light of the whole document." *A.D. Desmond Co.*, 223 Ill. App. 3d at 620.

¶ 28   The application form that BAT filled out for the 2008 policy does not include a definition of "claim." However, the 2008 policy, which was not attached to the application, defines "claim" in a manner consistent with common practice in the insurance industry. See Harold A. Weston, Annotation, *Lawyers' Professional Liability Insurance*, 92 A.L.R.5th 273 §§ 6(a), 6(d) (2001); *Continental Casualty Co. v. Cuda*, 306 Ill. App. 3d 340 (1999); *Ambrose v. United States*, 106 Fed. Cl. 152, 160 n.15 (2012). The 2008 insurance policy defines a claim as "a demand received by the INSURED for money or services, or the service of a suit or the initiation of an arbitration proceeding against the INSURED that seeks DAMAGES arising out of a WRONGFUL ACT[, or] an incident or circumstance of which the INSURED has knowledge that may result in a demand against the INSURED that seeks DAMAGES arising out of a WRONGFUL ACT."

¶ 29   A number of courts from several states have confronted questions about the date of a claim within the meaning of policies that defined a claim in language similar to that used in the ISBA's 2008 policy. In *Phoenix Insurance Co. v. Sukut Construction Co.*, 186 Cal. Rptr. 513 (Cal. Ct. App. 1982), Malter, an attorney, drafted a mechanics lien for Sukut. Sukut later learned that because of Malter's drafting, the lien might not provide the expected protection for Sukut's interests. On December 9, 1975, Sukut asked Malter to work without pay to correct the problem with the lien. Malter did not agree to Sukut's request. Sukut filed a legal malpractice action against Malter on August 16, 1976. The *Phoenix* court held:

> "A claim, both in its ordinary meaning, and in the interpretation given to it by other courts in similar circumstances [citation], is a demand for something as a right, or as due. A formal lawsuit is not required before a claim is made. [Citation.]
>
> Here a claim was made against Malter, when at the December 9, 1975, meeting, Sukut asked him to work for free to cure the problems created by the mechanics lien's inadequacies." *Phoenix Insurance*, 186 Cal. Rptr. at 515.

¶ 30   In *Clauson & Atwood v. Professionals Direct Insurance Co.*, No. 12-cv-199-JL, 2013 WL 1966058 (D.N.H. May 13, 2013), the law firm of Clauson & Atwood represented Yager in a lawsuit for trespass. The trial court entered summary judgment against Yager on his claim. In

February 2011, Orr & Reno, a law firm, notified Clauson & Atwood that Yager had retained Orr & Reno to advise him about the possibility of suing Clauson & Atwood for legal malpractice. Yager filed a legal malpractice lawsuit against Clauson & Atwood on February 10, 2012. Clauson & Atwood then notified its insurer of the claim. The *Clauson & Atwood* court held that Yager made the claim no later than February 2011, when Yager's new attorneys notified Clauson & Atwood of the possibility of litigation.

¶ 31 Here, Tango notified Tibble of its dissatisfaction with his services, and the potential for a malpractice suit, in November 2002, and Tibble notified his insurer of the claim on December 5, 2002. Construing any ambiguity in the insurance contract, and the application incorporated into the contract, in favor of BAT (*Quarles v. Nationwide Insurance Co.*, 66 Ill. App. 3d 455, 462 (1978)), we find that Tango made the claim in November 2002, and not when Tango filed its lawsuit against Tibble in 2005. On December 11, 2007, BAT said in its application that during the preceding five years no claim had been made against any current member of BAT. Because Tango made its claim against Tibble more than five years before BAT submitted the application, we find that BAT made no misrepresentation in its application. If the ISBA wanted to know of any claims against BAT attorneys made more than five years before the application but resolved less than five years before the application, it needed to ask a question that would elicit that information. If the ISBA wanted to know about any lawsuits filed against BAT attorneys within five years of the date of the application, regardless of the date on which the person filing the lawsuit made its claim, it needed to ask a question about the lawsuits filed, and not just about the claims made, within five years. See *Grinnell Mutual Insurance Co. v. LaForge*, 369 Ill. App. 3d 688, 697-98 (2006) (distinguishing claims from suits in construction of insurance policy).

¶ 32 BAT made no misrepresentation in its application for the 2008 insurance policy and, therefore, the trial court erred when it granted rescission of the 2008 insurance policy. We reverse the order granting the ISBA rescission of the 2008 policy. In view of the reversal of the order granting rescission of the 2008 and 2009 policies, we also reverse the award of reimbursement and costs to the ISBA and the order requiring the ISBA to reimburse BAT for the premiums paid for the 2008 and 2009 policies. We need not address BAT's other arguments.

¶ 33 CONCLUSION

¶ 34 Because the ISBA presented no evidence of any misrepresentations in the application for the 2009 insurance policy, the trial court erred when it rescinded the 2009 policy. The evidence showed that Tango made its claim against Tibble more than five years before BAT applied for the 2008 policy, and therefore, the ISBA did not prove that BAT made any misrepresentations in its application for the 2008 policy. Accordingly, we reverse the judgment of the trial court.

¶ 35 Reversed.