In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3310

TITLE INDUSTRY ASSURANCE COMPANY, R.R.G.,

*Plaintiff-Appellant*,

*v.*

FIRST AMERICAN TITLE INSURANCE COMPANY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 1906 — **Samuel Der-Yeghiayan**, *Judge*.

ARGUED APRIL 4, 2016 — DECIDED APRIL 10, 2017

Before EASTERBROOK and HAMILTON, *Circuit Judges*, and
PEPPER, *District Judge*.[*]

HAMILTON, *Circuit Judge*. This appeal illustrates a recurring issue for liability insurers and their insureds: how to determine whether the insurer owes a duty to defend its insured when a claim is first asserted against the insured, before the

---

[*] The Honorable Pamela Pepper, United States District Judge for the Eastern District of Wisconsin, sitting by designation.

insurer knows the underlying facts. The insured here was
Chicago Abstract Title Agency LLC, which was in the title and
escrow services business. In 2008, Chicago Abstract was sued
in state court by a title insurance company and two financial
firms. Chicago Abstract tendered these lawsuits to its "errors
and omissions" liability insurer, plaintiff Title Industry As-
surance Company, R.R.G., known in this case as TIAC. TIAC
then faced a choice. It could (a) defend Chicago Abstract with-
out reservation; or (b) defend while reserving its rights; or (c)
seek a declaratory judgment concerning the scope of cover-
age. TIAC could also (d) decline to defend, but only if the al-
legations in the complaints against Chicago Abstract clearly
fell outside the scope of the insurance policy, and then only at
its peril. Under Illinois law, when a liability insurer unjustifi-
ably refuses to defend a suit against its insured, the insurer
will be estopped from later asserting policy defenses to cov-
erage.

TIAC declined to defend the suits. The suits proceeded
and years passed without further communications between
TIAC and its insured. In 2014, one of the state court plaintiffs,
Coastal Funding, LLC, filed a fourth amended complaint
against Chicago Abstract. An attorney appointed by TIAC
then made a belated appearance in that case. At about the
same time, TIAC filed this diversity jurisdiction action in fed-
eral court, seeking a declaration that coverage was unavail-
able primarily because of two exclusions in the policy. Chi-
cago Abstract did not defend in the federal case (the company
had been involuntarily dissolved in 2009), but two of the state-
court plaintiffs—Coastal Funding and First American Title In-
surance Company—appeared in this federal case as defend-
ants. To avoid confusion, we refer to these two firms as the
Claimants.

TIAC and the Claimants filed cross-motions for summary judgment. The district court granted judgment to the Claimants. We affirm. We disagree with portions of the district court opinion, particularly its ruling that TIAC was required to plead legal theories in its federal complaint. That ruling is squarely at odds with settled federal pleading practice. See *Johnson v. City of Shelby*, 574 U.S. —, 135 S. Ct. 346 (2014) (summarily reversing dismissal of action for failure to identify legal theory in complaint). Nevertheless, we agree that the undisputed facts show that TIAC breached its duty to defend Chicago Abstract in the underlying litigation. TIAC is therefore estopped from asserting at this very late stage any policy defenses to coverage that might have been available if TIAC had made a different choice when the complaints were first tendered.

I.  *Undisputed Facts and Procedural Background*

A.  *Errors and Omissions Policy*

Chicago Abstract was a title insurance agency operating in Cook County, Illinois. As an agent for First American, a title insurance company with a nationwide footprint, Chicago Abstract provided property owners and lenders with real estate closing, loan closing, and title and escrow services. In 2008, TIAC issued to Chicago Abstract an "Abstracters, Title Insurance Agents and Escrow Agents Professional Liability Insurance" policy, more commonly known as an errors and omissions policy. The policy provided that TIAC would pay costs for which its "Insured" became liable "by reason of a wrongful act … aris[ing] out of professional services rendered or that should have been rendered." The term "Insured" was defined to include Chicago Abstract as well as its members and employees acting within the scope of their duties. Coverage

applied both to acts occurring during the policy period and to prior acts if, as of the policy's effective date, the Insured had no knowledge of those prior acts.

The policy listed two exclusions relevant in this appeal. Under exclusion (a), coverage did not apply to any claim arising out of or relating to "any dishonest, fraudulent, criminal, malicious or intentional wrongful acts committed by or at the direction of the Insured." A caveat in the policy, labeled condition (1), stated that whenever exclusion (a) was triggered, insurance would remain available for each Insured "who did not personally commit or personally participate in committing any of the wrongful acts described in [that] exclusion … and who had neither notice nor knowledge of such wrongful acts, if such Insured, upon receipt of notice or knowledge thereof, immediately notifies the Company of the aforesaid wrongful acts." Under exclusion (j), coverage did not apply to any claim arising out of or relating to "any defalcation, commingling of, or failure to pay any funds, notes, drafts, or other negotiable instruments."

B. *Underlying Complaints and Procedural History*

In the fall of 2008, Chicago Abstract was underwater and failing fast. Records were out of order. Transactions were askew. Employees were unsupervised. Most alarming, an outside audit uncovered a significant shortfall in the agency's escrow account. In this unfolding crisis, without the benefit of a comprehensive investigation and with only a hazy understanding of the facts, First American and two lenders that had done business with Chicago Abstract sought help in court.

On November 5, 2008, First American sued Chicago Abstract and its two members, Michael Kons and Steve Knupp,

in the Circuit Court of Cook County. First American alleged that Chicago Abstract had facilitated escrow closings for "irregular and suspicious" real estate "flip" transactions using First American's insurance policies and closing protection letters. A "flip" or A–B–C transaction involves an investor (B) who buys discounted property from a defaulting homeowner or foreclosing lender (A) using a short-term unsecured loan and then immediately "flips" the property by selling to a third-party buyer (C) for a higher price. Assuming both sides of the transaction close, the investor (B) pays off the short-term loan and pockets the profits. First American's complaint accused Chicago Abstract of executing "flip" transactions "contrary to the spirit and purpose" of its agency contract. First American added that Chicago Abstract was not maintaining proper documentation; that Chicago Abstract had commingled escrow funds belonging to property owners, investors, and lenders; and that Chicago Abstract may have misappropriated some of those funds. First American sought emergency injunctive relief, up to and including appointment of a receiver, as well as damages for breach of contract.

Several weeks later, 1st Funding Source, LLC, a private capital firm, intervened in the First American action. 1st Funding had agreed to finance the A–B side of four "flip" transactions for which Chicago Abstract served as title agent. For each transaction, Chicago Abstract was authorized to disburse the short-term loan proceeds only on condition that both sides (A–B and B–C) had irrevocably closed. Chicago Abstract allegedly breached its agreement with 1st Funding by disbursing the proceeds before ensuring that the B–C transaction closed. 1st Funding pled counts for breach of contract, breach of fiduciary duty, and negligence.

Finally, on Christmas Eve 2008—less than two months af-
ter First American filed suit—Coastal Funding brought a sep-
arate action in the Circuit Court of Cook County against Chi-
cago Abstract, First American, and a person named Donnel
Thomas (elsewhere spelled "Donell"). Like 1st Funding,
Coastal Funding had supplied short-term financing for "flip"
transactions for which Chicago Abstract served as title agent.
Back in October 2008, Coastal Funding had wired $1,370,000
into Chicago Abstract's general escrow account with the ex-
pectation that the funds would be segregated in a fiduciary
trust account. According to Coastal Funding, Chicago Ab-
stract breached its fiduciary duty and committed the tort of
conversion by "misappropriating" those funds. Coastal Fund-
ing also alleged that Donnel Thomas duped it into participat-
ing in a Ponzi scheme using Chicago Abstract's services and
that the "flip" transactions—which it had believed were law-
ful and legitimate—were mere stages of the scheme.

Chicago Abstract tendered the three underlying com-
plaints to TIAC "for defense and indemnification" on Febru-
ary 3, 2009. On July 8, 2009, Chicago Abstract, operating by
then under receivership, notified TIAC of two potential
claims by First American for missing escrow funds. In letters
dated July 31 and August 13, 2009, TIAC denied coverage for
the underlying suits and the potential claims. The denial let-
ters cited policy exclusions (a) and (j) and asserted that the
policy did not cover the remedies that the state court plaintiffs
sought. TIAC reiterated its coverage position without expla-
nation in a letter dated August 12, 2011.

The state-court litigation proceeded without TIAC's in-
volvement. In 2011, the state court entered two orders grant-
ing default judgment against Chicago Abstract on six counts

of Coastal Funding's then-controlling complaint. In 2013, First American and 1st Funding reached a settlement agreement that had the effect of resolving 1st Funding's claims against Chicago Abstract. First American has not settled with Chicago Abstract.

In 2014, Coastal Funding filed its fourth amended complaint in state court.[1] Chicago Abstract defaulted. Shortly after that, in an about-face, TIAC appointed counsel to defend Chicago Abstract in the Coastal Funding action. The state court then entered an order vacating the *default*, though the parties dispute whether that order also vacated the prior default *judgments*. (That's a question for the state courts; we do not consider it here.)

Around the same time that it began defending in state court, TIAC filed this action for a declaration of non-coverage on the bases of exclusions (a) and (j), as well as a third defense no longer at issue. Claimants First American and Coastal Funding appeared as defendants in the federal action. Coastal Funding filed a counterclaim seeking a declaration that TIAC breached its duty to defend Chicago Abstract. On the parties' cross-motions for summary judgment, the district court granted judgment in favor of the Claimants, finding TIAC in breach and holding that TIAC is estopped from asserting any defenses to coverage. *Title Industry Assurance Co. v. Chicago*

---

[1] Coastal Funding's fourth amended complaint alleges a fraudulent scheme involving Chicago Abstract employee Juan Orozco and Donnel Thomas (the individual defendant named in Coastal Funding's first complaint). In 2010, Orozco, Thomas, and their associates were charged with federal wire fraud in connection with a real estate Ponzi scheme spearheaded by Thomas. Orozco pled guilty several years later.

*Abstract Title Agency*, No. 14 C 1906, 2015 WL 5675544, at \*6–7 (N.D. Ill. Sept. 24, 2015). This appeal followed.

II.  *Analysis*

We review *de novo* the district court's grant of summary judgment, viewing all facts and drawing all reasonable inferences in favor of TIAC, the party against whom judgment was entered. *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017), citing *Dunnet Bay Construction Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015). The interpretation of an insurance policy and the contours of the insurer's duty to defend are questions of state law. Illinois substantive law controls here.

A.  *The Duty to Defend*

Liability insurers often encounter the problem that TIAC faced in this case. Liability insurance policies require insureds to notify their insurers of claims promptly, often on penalty of forfeiting coverage if they delay. Upon receiving such notice, the insurer then must make a prompt decision: will it defend or will it deny coverage? Often, as in this case, the insurer must make this decision before it has time to investigate all the relevant facts.

"The oft-repeated refrain of Illinois insurance law is that an insurer's duty to defend is 'much broader' than its duty to indemnify." *Landmark American Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016), quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993). "A duty to defend will arise when the allegations of the underlying complaint may potentially come within the coverage of the policy." *Westfield Ins. Co. v. West Van Buren, LLC*, 59 N.E.3d 877, 882 (Ill. App. 2016). The insurer may not simply refuse to de-

fend a suit against its insured unless it is clear from the underlying complaint "that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1136 (Ill. 1999) (citation omitted).

Illinois law provides two avenues for an insurer that is uncertain of its obligations under the policy. It may "defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage." *Id.* An insurer that fails to take either of these actions does so at its peril. If a court later finds that the insurer breached its duty to defend, the insurer will be estopped from asserting policy defenses to coverage. *Edward T. Joyce & Associates, P.C. v. Professionals Direct Ins. Co.*, 816 F.3d 928, 932 (7th Cir. 2016), citing *Ehlco Liquidating Trust*, 708 N.E.2d at 1135.

In deciding whether an insurer breached its duty, Illinois courts ordinarily apply the "eight-corners" rule: "the court 'compares the four corners of the underlying complaint with the four corners of the insurance policy to determine whether facts alleged in the underlying complaint fall within or potentially within coverage.'" *American Alternative Ins. Corp. v. Metro Paramedic Services, Inc.*, 829 F.3d 509, 513–14 (7th Cir. 2016) (citation omitted); see also *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069, 1073 (7th Cir. 2004) (insurer's duty to defend is "determined by the allegations of the complaint … rather than by what is actually proved").

When an insurer brings a timely declaratory judgment action, Illinois courts may look beyond the four corners of the underlying complaint and consider extrinsic evidence, such as a separate but related pleading. See *Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1020 (Ill. 2010) ("To require the trial court to

look solely to the complaint in the underlying action to deter-
mine coverage would … greatly diminish a declaratory ac-
tion's purpose of settling and fixing the rights of the parties.")
(emphasis and citation omitted). But where the insurer fails to
bring a timely declaratory judgment action and the question
before the court is whether the insurer breached its duty to
defend, the court confines its review to the insurance policy
and the underlying complaint, absent unusual circumstances.
Compare *Hilger*, 838 F.3d at 824 ("[W]hen an insurer tries to
deny coverage *without* seeking a declaratory judgment *or* de-
fending under a reservation of rights … the relevant question
is whether the insurer justifiably refused to defend the action
based solely on the allegations in the complaint, so the court's
inquiry is necessarily limited to those allegations."), with
*Bartkowiak v. Underwriters at Lloyd's, London*, 39 N.E.3d 176,
179, 182 (Ill. App. 2015) (trial court did not err in taking ac-
count of tortfeasor's primary insurance coverage that was not
specifically referenced in underlying complaint or in defend-
ant's policy but that was known to defendant at the time it
denied coverage, was the basis for that denial, and was an ob-
jective, undisputed fact).

    In conducting its review, the court liberally construes the
underlying complaint and the insurance policy in the manner
reasonably most favorable to the insured. The court gives lit-
tle weight to the legal labels attached to the underlying alle-
gations. *Selective Ins. Co. of South Carolina v. Target Corp.*, 845
F.3d 263, 270 (7th Cir. 2016). Because the duty to defend usu-
ally depends on the contents of these written documents—the
insurance policy and the complaints against the insured—the
issue can often be decided on a motion for summary judg-
ment. E.g., *Metro Paramedic*, 829 F.3d at 516 (affirming sum-

mary judgment for insured); *Hartford Casualty Ins. Co. v. Karlin, Fleisher & Falkenberg, LLC*, 822 F.3d 358, 361 (7th Cir. 2016) (affirming summary judgment for insurer).

The rule of Illinois law most important here is that if the underlying complaint alleges several theories of recovery, the insurer's duty to defend arises "even if only one such theory is within the potential coverage of the policy." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010) (citation omitted); see also *Nat'l American Ins. Co. v. Artisan & Truckers Casualty Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (insurer must defend against covered claims despite presence of "proscribed theory of recovery"); *Wilson*, 930 N.E.2d at 1015 n.2 (where insurer has duty to defend against at least one count of underlying lawsuit, it must then defend against all counts).

### B. *Prior Knowledge Provision*

Before digging into the exclusions that TIAC relied upon in in its denial letters, we must address an argument that TIAC raised for the first time in federal court—that the prior knowledge provision in the policy's insuring agreement and in a related question on the insurance application barred coverage of the underlying claims. The prior knowledge provision stated that TIAC would cover damages relating to wrongful acts occurring "prior to the policy period provided that on the effective date of th[e] policy the Insured has no knowledge of such wrongful act[s]."

The Claimants argue that TIAC waived its right to rely on the prior knowledge provision by failing to cite that provision in its letters denying coverage. Those letters said nothing about Chicago Abstract's prior knowledge. In fact, it was not

clear that TIAC intended to rely on the prior knowledge provision until it filed its motion for summary judgment in this untimely declaratory judgment action (though TIAC did allude to the provision in its answer to Coastal Funding's counterclaim). Federal notice pleading requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so TIAC's failure to refer to the prior knowledge provision in its declaratory judgment complaint is not fatal. However, Illinois substantive law controls in this diversity dispute. Illinois courts recognize that a "long delay in asserting a policy defense … may constitute a waiver of that defense," though the party asserting waiver must prove that it has been prejudiced by the delay. E.g., *Rosalind Franklin Univ. of Medicine & Science v. Lexington Ins. Co.*, 8 N.E.3d 20, 44 (Ill. App. 2014). Illinois courts also recognize the "mend-the-hold" doctrine, which "preclude[s] insurers from denying a claim on one basis and then changing [the] basis for denial during litigation" if there is evidence of unfair surprise or arbitrariness. E.g., *FHP Tectonics Corp. v. American Home Assurance Co.*, 57 N.E.3d 575, 587 (Ill. App. 2016); *Grinnell Mutual Reinsurance Co. v. LaForge*, 863 N.E.2d 1132, 1140 (Ill. App. 2006).

The Claimants rely on the doctrines of both waiver and "mend-the-hold," arguing that TIAC's late assertion of the prior knowledge provision prejudiced them because they "did not engage in any discovery related to 'prior knowledge' or alleged misrepresentations in the renewal application." While the Claimants have not made an especially strong showing of prejudice, TIAC has offered no justification for its delay. "[S]trong proof is not required to show a waiver of a policy defense, but only such facts as would make it unjust,

inequitable or unconscionable to allow the defense to be interposed." *Rosalind Franklin Univ.*, 8 N.E.3d at 44 (citation omitted).

Moreover, even if TIAC's late assertion of the prior knowledge provision could be excused, the assertion would fail on its merits. Chicago Abstract's errors and omissions policy became effective July 24, 2008. Nothing in the complaints tendered to TIAC implicated Chicago Abstract or its principals (the defendants in the underlying suits) in any misconduct occurring before that date.

To support its denial decision, TIAC points to a letter that Chicago Abstract received from First American and forwarded to TIAC before it denied coverage. In that letter, First American warned that Chicago Abstract might "have liability for numerous matters stemming from the activities within [its] operation," involving transactions "during a period of time from approximately May 2008–October 2008." First American's early guesstimate as to the date range during which problem transactions may have occurred is not a useful measure for determining the point at which Chicago Abstract and its agents were on notice of any wrongful acts. At most, First American's letter might have prompted TIAC to investigate whether its Insured had advance knowledge of a potential claim. The letter could not justify TIAC's flat refusal to defend its Insured.

In rejecting TIAC's reliance on the prior knowledge provision, we do not decide whether the outcome might be different if the summary judgment record contained concrete evidence to support a finding that, as of the policy's effective date, Chicago Abstract and its principals were on notice of a

claim or of conduct likely to result in a claim. The record contains no such concrete evidence. Coastal Funding's fourth amended complaint—the pleading that precipitated TIAC's late entry in the underlying litigation—includes a few vague allegations suggesting that Chicago Abstract's principals may have suspected trouble was afoot during the summer of 2008. But that pleading does not allege—and there is certainly no evidence in the summary judgment record to support a finding—that the principals knew about a Ponzi scheme or any missing funds at that time.

Mere suspicion of questionable transactions does not trigger the prior knowledge provision. That provision requires, well, knowledge. There is no evidence that Chicago Abstract and its principals had such knowledge as of July 24, 2008.[2] We therefore do not decide whether, if after-acquired evidence

---

[2] There is no dispute, of course, that Juan Orozco was aware of his own misdeeds. TIAC points out that the prior knowledge provision is triggered when the "Insured" has knowledge of a prior wrongful act. "Insured" is defined to include not only the entity but also its employees acting within the scope of their duties. TIAC argues that "Orozco's participation in and knowledge of the Ponzi scheme is sufficient to trigger the prior knowledge provision." TIAC assumes (without developing the point) that Orozco was acting within the scope of his employment in facilitating a Ponzi scheme, a dubious proposition. In any event, TIAC's argument proves too much. When viewed as a whole, the errors and omissions policy included important protections for innocent Insureds. Condition (1), in particular, preserved coverage for claims relating to fraud for any Insured "who did not personally commit or personally participate in committing" the fraud and who had "neither notice nor knowledge" of the fraud, provided that the Insured "upon receipt of notice or knowledge … immediately notifies the Company." That protection for innocent Insureds would be nullified if a single employee's wrongdoing were enough to nullify coverage. We decline to read the policy so as to undermine that important protection.

showed that Chicago Abstract or its principals actually knew about wrongful acts and/or looming claims when they applied for coverage, the ordinary estoppel rules would give way. TIAC points to no authority that would require that result, though the equities and policy arguments might support that conclusion. That is not this case, so we decline to predict how the Illinois Supreme Court would decide that issue. With neither contemporaneous nor after-acquired evidence that would trigger the prior knowledge provision, TIAC's argument fails on its merits.

C. *TIAC's Bases for Denying Coverage*

1. *Exclusion (a)*

We turn now to the provisions TIAC invoked in denying coverage back in 2009. Exclusion (a) withheld coverage for any claim relating to "any dishonest, fraudulent, criminal, malicious or intentional wrongful acts committed by or at the direction of the Insured." Exclusion (a) does not justify TIAC's refusal to defend against the tendered suits.

Later-filed pleadings and subsequent developments show that the Claimants' damages were attributable at least partly to fraud by someone. But the complaints *as tendered* did not compel that conclusion. At most they placed TIAC on notice that one or more of the underlying claims might be subject to exclusion (a). The presence of a theory excluded from coverage simply does not excuse an insurer from its duty to defend its insured. *Artisan & Truckers*, 796 F.3d at 723; see also *Santa's Best*, 611 F.3d at 346 (where underlying complaint presents several theories of recovery, "the duty to defend arises even if only one such theory is within the potential coverage of the policy") (citation omitted).

Most of the allegations in the tendered complaints had no obvious relationship to a fraud claim, though just one path toward a covered claim would have been enough to trigger the duty to defend. First American's complaint accused Chicago Abstract of breach of contract, and it alleged a host of errors and omissions that could arise as easily from negligence as from intentional wrongdoing. The complaint also alleged "irregular and suspicious" real estate transactions and suggested that Chicago Abstract's agents may have misappropriated escrow funds. Those nebulous allegations did not indisputably remove the complaint from coverage, which is what would have been required to avoid the duty to defend. 1st Funding settled and has not appeared in TIAC's federal case, but nothing in 1st Funding's complaint changes our analysis. 1st Funding alleged that Chicago Abstract disbursed loan proceeds before all conditions were met. It accused Chicago Abstract of negligence and breaches of contract and fiduciary duty. It did not accuse Chicago Abstract of fraud.

The Coastal Funding complaint presents a somewhat closer question, but the result is the same. Coastal Funding accused Chicago Abstract of misappropriating and/or converting $1,370,000. Conversion is an intentional tort, but conversion does not include as an element the intent to defraud. It does not require proof of a criminal or otherwise culpable mental state. Rather, the tortfeasor must simply act intentionally in a manner that exercises dominion over the property of another without authorization. Whether he does so maliciously or by innocent mistake, the action is still conversion. See *Longo Realty v. Menard, Inc.*, 59 N.E.3d 1, 11 (Ill. App. 2016) ("Conversion requires the plaintiff establish by a preponderance of the evidence: (1) the defendant's unauthorized and wrongful assumption of control, dominion, or ownership

over the plaintiff's personal property; (2) the plaintiff's right in the property; (3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) the plaintiff's demand for possession of the property."); *Martel Enterprises v. City of Chicago*, 584 N.E.2d 157, 159 (Ill. App. 1991) ("Although conversion is considered an intentional tort because it requires 'an intentional exercise of dominion or control over a chattel,' it does not require proof of malice, culpability, or conscious wrongdoing.") (citations omitted).

Coastal Funding's allegations of misappropriation and conversion were factually threadbare, amounting to little more than legal conclusions. That's not surprising, given the urgency with which the complaint had to be prepared. Legal conclusions standing alone will not justify an insurer's refusal to defend its insured. See *Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 745 (7th Cir. 2001) ("What is important is not the legal label that the plaintiff attaches to the defendant's … conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers."); *International Ins. Co. v. Rollprint Packaging Products, Inc.*, 728 N.E.2d 680, 688 (Ill. App. 2000) ("The question of coverage should not hinge on the … whims of the plaintiff in the underlying action.").[3]

Coastal Funding did plead one fraud count that was more factually robust, but that count named only Donnel Thomas, a third party whose association with Chicago Abstract was

---

[3] Coastal Funding's first amended complaint, which it filed on July 27, 2009, added some spare factual content pertaining to Chicago Abstract's alleged misconduct. There is no indication TIAC received, let alone reviewed, that amended complaint before denying coverage four days later.

unexplained. TIAC could not reasonably have construed the allegations against Thomas as somehow excluding coverage for its Insured. This is particularly so in light of the policy's condition (1), which provided that the fraud exclusion would not bar coverage for any Insured who neither participated in nor knew about the fraud, provided the Insured notified TIAC upon learning of the misconduct.

The decisive point is that the underlying complaints, whether read individually or together, did not compel the conclusion that the Claimants' losses were attributable to intentional wrongdoing by Chicago Abstract and its agents. See *U.S. Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 550 N.E.2d 1032, 1036 (Ill. App. 1989) ("[S]ince the underlying claims arise from the same set of circumstances, the allegations in any single complaint can be inferred in the other complaints."), *aff'd*, 578 N.E.2d 926 (Ill. 1991). The undisputed facts show that exclusion (a) could not justify TIAC's refusal to defend its Insured at the time of tender.[4]

---

[4] TIAC's brief includes an extended discussion of *Gulf Underwriters Ins. Co. v. KSI Services, Inc.*, 233 F. App'x 239 (4th Cir. 2007). We are not sure why. Apart from being non-precedential even in its home circuit, *Gulf Underwriters* is inapposite. In that case, the claimant—whose funds were embezzled by the insured's bookkeeper—filed the underlying suit after the bookkeeper's fraud came to light and after she pled guilty. The Claimants here, aware only of funds missing under fishy circumstances, rushed to the courthouse to preserve the status quo long before they had a clear sense of the cause and extent of their damages. Their broad and vague pleadings reflect legal triage in a crisis, not definitive grounds for concluding that Chicago Abstract had engaged in intentional wrongdoing that would defeat coverage.

2. *Exclusion (j)*

TIAC also denied coverage based on exclusion (j), which withheld coverage from any claim relating to "any defalcation, commingling of, or failure to pay any funds." Exclusion (j) also does not justify TIAC's denial of coverage.

Defalcation is an undefined term in the policy. The term is commonly used in the bankruptcy context, where it describes a "culpable state of mind" involving "knowledge of, or gross recklessness in respect to, the improper nature of … relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. —, —, 133 S. Ct. 1754, 1757 (2013). More generally, the term connotes fraud or embezzlement, though broader usages also have been recognized. See *Defalcation*, *Black's Law Dictionary* 506 (10th ed. 2014). As discussed above, TIAC could not refuse to defend its Insured on the basis of a fraud exclusion.

As for commingling, only one underlying pleading—the First American complaint—included such an allegation, and commingling was not an essential aspect of First American's lawsuit. As for the undefined phrase "failure to pay," the Claimants argue that they alleged the very opposite in state court: they alleged that Chicago Abstract *did pay* (i.e., disburse) escrow funds under circumstances in which it should not have done so. TIAC perhaps could have countered that "failure to pay" should be read broadly to encompass Chicago Abstract's failure to *return* funds to the lenders, but neither exclusion (j) nor the state court complaints were clear enough to establish that no claim could possibly fall within the scope of coverage. TIAC might have been able to assert a successful defense to coverage during litigation, but even if

that were true, it would not follow that TIAC was entitled to abandon its Insured at the outset of litigation.[5]

### 3. *Northbrook Property and "Wholly Independent" Acts*

TIAC argues that the district court should have enforced exclusion (a) and/or exclusion (j) on the ground that the underlying complaints included some allegations that, if proved, might have fallen outside the scope of coverage. According to TIAC, "where a claim alleges injuries caused by both excluded acts and non-excluded acts," the insurer must defend only if the non-excluded acts were "wholly independent" of the excluded acts. TIAC's proposition is difficult to square with the settled principle of Illinois law that if the "underlying complaints allege several theories of recovery … the duty to defend arises even if only one such theory is within the potential coverage of the policy." *Santa's Best*, 611 F.3d at 346 (citation omitted). In fact, the cases TIAC cites for its "wholly independent" argument are readily distinguishable from this case and illustrate the narrow application of that rule.

TIAC relies principally on *Northbrook Property & Casualty Co. v. Transportation Joint Agreement*, 741 N.E.2d 253 (Ill. 2000), where a general liability policy excluded injuries stemming

---

[5] To support its argument about exclusion (j), TIAC relies on *Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035 (8th Cir. 2013), which applied Minnesota law to uphold denial of a defense under a title insurer's errors and omissions policy. The exclusion at issue in that case was broader than exclusion (j) here, as it reached claims relating to "loss, disappearance … or shortage" of funds, as well as commingling and misappropriation. Also, the underlying complaint was narrower, alleging intentional wrongdoing and leaving no room for innocent mistake. *Id.* at 1037, 1040. Those differences were critical to the Eighth Circuit's decision.

from "ownership, maintenance, use or entrustment" of a vehicle. *Id.* at 254. The underlying complaints alleged that students were injured when a train collided with the insured school district's school bus. Those complaints "utterly fail[ed] to state facts which either actually or potentially" brought the complaints "within the policy's coverage." *Id.* While the claimants attempted to argue around the vehicle exclusion by characterizing the students' injuries as resulting from the school district's failure to select safe bus routes, those allegations were "nothing more than rephrasings of the fact that the students' injuries arose from the school districts' use or operation of a motor vehicle." *Id.* The students were harmed in an excluded bus accident. Causation was not in dispute, and state of mind was irrelevant. No set of facts consistent with the allegations in the underlying complaints could have brought those complaints within the scope of coverage.[6]

---

[6] TIAC's other cases parallel the analysis in *Northbrook Property*. See *State Farm Fire & Casualty Co. v. Perez*, 899 N.E.2d 1231 (Ill. App. 2008) (injury caused by automobile accident excluded; insurer had no duty to defend against negligent modification claim relating to modified seats); *Massachusetts Bay Ins. Co. v. Unique Presort Services, Inc.*, 679 N.E.2d 476 (Ill. App. 1997) (injury caused by automobile accident excluded; insurer had no duty to defend against "inextricably intertwined" claim for violation of drug testing regulation); *Oakley Transport, Inc. v. Zurich Ins. Co.*, 648 N.E.2d 1099 (Ill. App. 1995) (injury caused by automobile accident excluded; insurer had no duty to defend against "inextricably intertwined" claim for negligent supervision of driver); see also *Nautilus Ins. Co. v. 1452–4 N. Milwaukee Avenue, LLC*, 562 F.3d 818 (7th Cir. 2009) (damages caused by faulty contractor work excluded; insurer had no duty to defend against "intertwined" negligence and statutory claims). In each of these cases, the gravamen of the underlying claim was an excluded injury. The courts refused to allow claimants and insureds to avoid unambiguous exclusions with artful labeling.

In this case, when the Claimants filed their initial plead-
ings, the circumstances surrounding their injuries or possible
injuries were murky at best. Records were missing. Transac-
tions were unaccounted for. Chicago Abstract's escrow account
was short of cash, but it was not clear who or what was respon-
sible for the shortage. The Claimants sought emergency judi-
cial intervention to preserve the status quo and to avoid further
losses while they sorted through the facts. Their vague plead-
ings reflected their uncertainty. Many of the allegations related
to one another only generally, and at least one theory—in fact,
*most* theories—fell outside exclusions (a) and (j).

First American alleged that Chicago Abstract had engaged
in "irregular and suspicious" transactions and that its agents
appeared to have commingled and misappropriated escrow
funds. But First American also accused Chicago Abstract of
failing to account for the funds, failing to turn over records,
issuing unauthorized insurance policies, neglecting to super-
vise its employees, and wrongfully holding itself out as an
agent of First American. 1st Funding intervened in the First
American action, citing a series of incidents in which Chicago
Abstract allegedly disbursed loan proceeds before all condi-
tions were satisfied. Coastal Funding filed a separate com-
plaint in which it speculated that Chicago Abstract may have
converted its funds. But in that same complaint, Coastal
Funding alleged that it had fallen prey to a Ponzi scheme or-
chestrated by Donnel Thomas, a third party whose associa-
tion with Chicago Abstract was unclear.

We now know that Thomas had an inside man at Chicago
Abstract: Juan Orozco, the employee who was eventually con-
victed of wire fraud for his part in Thomas's Ponzi scheme.
But the Claimants did not know that or allege that when they

filed their complaints in 2008. Nor is there any indication that anyone at TIAC was aware of Orozco's crimes when it denied coverage in 2009. Even if TIAC had known about Orozco, a fraud claim—unlike a motor vehicle tort, see *Northbrook Property*, 741 N.E.2d at 254—requires the finder of fact to ascertain the tortfeasor's state of mind. Before undertaking fact discovery, TIAC could not possibly have known whether its Insured, defined to include not only Chicago Abstract but also its members and employees acting within the scope of their employment, were in on the scheme, aware of the scheme, or innocent victims of the scheme. TIAC could not preemptively refuse to defend its Insured on the basis of facts it did not and could not then know.

The search for *Northbrook Property*'s "wholly independent" cause of injury is futile when the primary cause of injury is unknown. Based on the "eight corners" of the tendered complaints and the insurance policy, see *Metro Paramedic*, 829 F.3d at 513–14, the undisputed facts show no sufficient basis for TIAC to deny coverage.

D. *The Consequences of TIAC's Breach*

When TIAC breached its duty by denying a defense in 2009, it left its Insured high and dry. TIAC complains that Chicago Abstract did not "contest or object to TIAC's coverage declination." At oral argument, TIAC took the point one step further, suggesting that because Chicago Abstract did not challenge its denial decision, TIAC was unaware "that there was any suggestion that there might be coverage under the policy." Nonsense. Chicago Abstract placed TIAC on notice of its claim for coverage when it tendered the underlying complaints. TIAC cites no authority for the proposition that an insured must lodge an exception to a denial decision or follow

up, begging for reconsideration. On the contrary, Illinois courts even excuse insureds from complying with otherwise non-negotiable policy duties after receiving denial letters. E.g., *Owners Ins. Co. v. Seamless Gutter Corp.*, 960 N.E.2d 1260, 1271 (Ill. App. 2011) ("[A]n insurer should not be allowed to assert a blanket denial of coverage and then assert the insured's failure to provide proof of loss, since the law does not require the insured to perform what appeared to be a useless act."); *Jones v. Universal Casualty Co.*, 630 N.E.2d 94, 101 (Ill. App. 1994) (same).

When an insurer learns of a claim against its insured, the ball is in the insurer's court. It may defend under a reservation of rights, or it may seek judicial input as to its obligations under the policy. But if it refuses to defend, it cannot then blame the insured for failing to win it over, particularly where—as here—the insured faces significant exposure and must make prompt and difficult decisions regarding litigation or settlement. Cf. *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322, 334 (Ill. 1991) (estoppel did not apply where insurers did not abandon insureds but instead (1) sent letters expressing concerns about coverage, (2) evaluated claims under express reservation of rights, and (3) subsequently sought declaratory judgment).

Though TIAC did appear in the Coastal Funding action and file for declaratory relief in federal court five years later, those long-overdue actions cannot excuse its breach of duty back in 2009. By the time TIAC saw fit to intervene, 1st Funding had settled its claims against Chicago Abstract, which had also defaulted on multiple counts in the Coastal Funding case. "Where an insurer waits to bring its declaratory judgment action until after the underlying action has been resolved by a

judgment or a settlement, the insurer's declaratory judgment action is untimely as a matter of law." *Ehlco Liquidating Trust*, 708 N.E.2d at 1138; cf. *Korte Construction Co. v. American States Ins.*, 750 N.E.2d 764, 770 (Ill. App. 2001) ("[T]he insurer must take some action to adjudicate the issue of coverage or undertake to defend the insured under a reservation of rights, and it must take that action within a *reasonable time* of a demand by the insured.") (emphasis added).

"The world is a dangerous and litigious place. People and businesses buy liability insurance in large part for peace of mind—the knowledge that if one is sued, the insurer will provide a legal defense … ." *CE Design Ltd. v. King Supply Co.*, 791 F.3d 722, 727 (7th Cir. 2015) (Hamilton, J., concurring). When an insurer breaches its duty to defend, "it's not just any breach of contract. An insurer's breach abandons its insured and deprives it of the peace of mind it has bought." *Id.*; see also *Pompa v. American Family Mutual Ins. Co.*, 520 F.3d 1139, 1146 (10th Cir. 2008) ("'By purchasing insurance, the insured reasonably expects that he will not be required to furnish the cost of defending actions that facially fall within the terms of his policy.' The insured will be deprived of the peace of mind that insurance promises if the insurer can refuse to defend the case, await developments, and then decide to reimburse the insured for defense costs only once it is clear that there was coverage.") (citations omitted); *Cates Construction, Inc. v. Talbot Partners*, 980 P.2d 407, 416 (Cal. 1999) ("In general, insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe.").

Under Illinois law, an insurer that breaches its duty to defend and abandons its insured is estopped from later invoking policy defenses to indemnity. See *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015); *Philadelphia Indemnity Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 400 n.6 (7th Cir. 2014). This Illinois rule of estoppel is strong stuff, but it is intended to protect insureds' reasonable expectations of coverage when they most need it. Because TIAC breached its duty to its Insured, it is barred from asserting any policy defenses to coverage that might have applied otherwise. As a practical matter, this means TIAC is on the hook for the judgment or any reasonable settlement amount that the Claimants ultimately recover against TIAC's Insured. See *Delatorre v. Safeway Ins. Co.*, 989 N.E.2d 268, 276 (Ill. App. 2013) ("When an insurer wrongfully refuses to defend [its insured], it is liable … for breach of contract. The measure of damages for such a contractual breach is generally the amount of the judgment against the insured."), citing *Fidelity & Casualty Co. of New York v. Mobay Chemical Corp.*, 625 N.E.2d 151, 155 (Ill. App. 1992); see also *Guillen v. Potomac Ins. Co. of Illinois*, 751 N.E.2d 104, 114 (Ill. App. 2001) ("The measure of damages for … a breach is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred."), *aff'd as modified*, 785 N.E.2d 1 (Ill. 2003). In the end, TIAC's hasty abandonment of its Insured may cost it far more than it would have spent if it had simply honored its duty to defend. The judgment of the district court is

AFFIRMED.