In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3052

ZURICH AMERICAN INSURANCE COMPANY, *et al.*,

*Plaintiffs-Appellees,*

*v.*

OCWEN FINANCIAL CORPORATION, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 2873 — **Charles P. Kocoras**, *Judge.*

ARGUED OCTOBER 26, 2020 — DECIDED MARCH 12, 2021

Before EASTERBROOK, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Thanks to the diversity jurisdiction, federal courts are often asked to decide questions of insurance coverage; state law almost always provides the rule of decision in such cases. This is one of them. Zurich American Insurance sold a policy to Ocwen Financial, a debt-collection company. After a disgruntled consumer sued Ocwen, it tendered the dispute to Zurich, but Zurich asserted that policy

exclusions relieved it of any duty to defend. Zurich then asked a federal court to decide whether this was indeed the case. The district court issued a judgment declaring that Zurich had no duty to defend Ocwen in the underlying litigation, and Ocwen has appealed. We agree with the district court's reading of the policy and therefore affirm.

## I

At the time this suit was filed, Ocwen was a limited liability company whose sole member was Ocwen Mortgage Servicing, a company incorporated in the U.S. Virgin Islands with its principal place of business there. Zurich is incorporated in New York and has its principal place of business in Illinois. Since the parties were of diverse citizenship and the amount in controversy exceeds $75,000, the district court had jurisdiction under 28 U.S.C. § 1332(a).

Ocwen collects and services debts. In 2015, Tracy A. Beecroft sued Ocwen in federal court in Minnesota for its attempts to collect on a mortgage loan that Beecroft had discharged in bankruptcy. The bankruptcy discharge should have been the end of things, but it was not. To Beecroft's displeasure, Ocwen aggressively pursued her for this debt. The effects were traumatic for Beecroft: she suffered emotional and physical distress, including a stress-induced miscarriage, and she was later denied a mortgage because Ocwen wrongly reported the alleged default to credit agencies. Counts I through III of her complaint relied on the Fair Debt Collection Practices Act (FDCPA) and the Telephone Consumer Protection Act (TCPA); Count IV alleged common-law defamation; and Count V alleged common-law invasion of privacy.

**II**

From September 2010 to September 2016, Zurich insured Ocwen under a series of commercial general liability policies—a type of policy that entitles the insured to indemnification for various types of tort claims brought against it. The policies were largely identical and covered all damages caused by both "bodily injury" and "personal and advertising injury." But two provisions in the policies expressly excluded injuries resulting from conduct that violates certain laws.

The first exclusion, for "Recording and Distribution of Material or Information in Violation of Law," precludes coverage for bodily injury and personal and advertising injury:

> directly or indirectly arising out of or based upon any action or omission that violates or is alleged to violate:
>
> (1) The [TCPA] …
> (2) The CAN-SPAM Act of 2003 [Pub. L. No. 108-187] [and amendments] …
> (3) The Fair Credit Reporting Act [FCRA] … including the Fair and Accurate Credit Transaction Act; or
> (4) Any federal, state statute, ordinance or regulation other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, or any other legal liability, at common law or otherwise, that addresses, prohibits or limits the printing, dissemination, disposal, monitoring, collecting, recording, use of, sending, transmitting, communicating or distribution of material or information.

The second exclusion, for "Violation of Communication or In-formation Law," is similar in scope. It excludes bodily injury, property damage, and personal and advertising injury:

resulting from or arising out of any actual or alleged vio-lation of:

(A) the [TCPA], [Driver's Privacy Protection Act, or DPPA], or [CAN-SPAM Act]; or

(B) any other federal, state, or local statute, regulation or ordinance that imposes liability for the:

(1) Unlawful use of telephone, electronic mail, in-ternet, computer, facsimile machine or other com-munication or transmission device; or

(2) Unlawful use, collection, dissemination, disclo-sure or re-disclosure of personal information of any manner

by any insured or on behalf of any insured.

Soon after Beecroft filed her suit, Ocwen asked Zurich to provide a defense pursuant to the insurance agreement. Zur-ich refused; instead, it filed this declaratory judgment action against Ocwen, arguing that the policy exclusions just noted absolved it of any duty to defend or indemnify Ocwen in the Beecroft lawsuit. See 28 U.S.C. § 2201. Ocwen counterclaimed that Zurich breached its duty to defend, and Zurich re-sponded with a motion for judgment on the pleadings. In or-der to resolve that motion, the court had to compare the pol-icy language with the allegations in Beecroft's complaint.

Beecroft's initial complaint alleged that Ocwen frequently attempted to contact her as part of a debt-collection effort that included "letters, billing statements and repeated robocalls to

[her] cellular phone." She alleged that Ocwen "made approximately 58 phone calls to [her] cellular telephone using an automated telephone dialing system." The complaint described each of those 58 calls with specificity, including the date, time, and the caller ID. On two occasions, Beecroft picked up the phone and told Ocwen to stop calling.

In her first amended complaint, Beecroft expanded the list of the collection methods to "letters, billing statements and repeated robocalls to [her] cellular *and home telephone*." (Our emphasis.) Her initial and amended complaints asserted that Ocwen used an autodialer because, on the two times that Beecroft actually answered, there "was a significant delay before an operator would come onto the line and ask for [her]"—an allegedly telltale sign that Ocwen was using an autodialer before connecting her with a live operator.

Beecroft's second amended complaint added an allegation that "some or all of the call to [her] cellular phone, including but not limited to the [58] calls listed above, were made using: (a) Premier Global Dialer; (b) an IAT Predictive Dialer; (c) a Davox Dialer; (d) Aspect Dialer; or (e) similar dialing system that has the requisite capacity pursuant to the TCPA." In each version of the complaint, Beecroft maintained that Ocwen's actions "were done unfairly, unlawfully, intentionally, deceptively and absent bona fide error, lawful right, legal defense, legal justification or legal excuse." In other parts of the complaint, Beecroft alleged that:

> Ocwen and its agents intentionally and/or negligently caused emotional harm to [Beecroft] by engaging in highly offensive conduct in the course of collecting this debt, thereby invading and intruding upon [her] right to privacy. This conduct included over 58 phone calls

to [Beecroft's] cellular telephone and additional calls to Plaintiff's home phone … .

To similar effect, she asserted that Ocwen "intentionally and/or negligently interfered, physically or otherwise, with the solitude, seclusion and/or private concerns or affairs of this Plaintiff, namely, by repeatedly and unlawfully calling Plaintiff's cellular telephone with equipment prohibited by federal law."

After reviewing the insurance policy and Beecroft's complaint, the district court concluded that all of the factual allegations in Beecroft's complaint fell within the scope of the policy exclusions. To the extent that Counts I through III alleged conduct that violated the TCPA, it found that the policy exclusion's "catch-all" clause swept in the FDCPA as an "other statute" that regulates the communication of information. Because the FDCPA prohibits calls made with the "intent to annoy, abuse or harass," the court concluded that even if some of Ocwen's calls to Beecroft did not violate the TCPA, they still violated the FDCPA because they were made after Beecroft had asked Ocwen to stop calling. Calling someone after being asked to stop, the court thought, indicated an intent to abuse, harass, or at the very least annoy. The court also held that the common-law claims in Counts IV and V (defamation and invasion of privacy) were excluded because they were based on conduct "arising out of" the same operative facts as the conduct that was alleged to have violated the enumerated statutes.

Based on these findings, the court held that Zurich had no duty to defend Ocwen in the Underlying Litigation.[1] This appeal followed. Ocwen does not disagree with the district court's analysis of Counts I through IV; it argues only that the policy exclusion should not have applied to the common-law invasion-of-privacy claim in Count V. Ocwen contends that the potential for covered liability exists because the Beecroft complaint includes the possibility that (1) some calls were made to Beecroft's *home* phone using a *live* operator, and (2) some calls were not made with the intent to annoy, abuse, or harass. The first of these points would preclude TCPA liability, because that statute prohibits calls to landlines only if those calls use artificial or prerecorded voices. The second is designed to knock out the FDCPA theory, because that law does not cover calls that were made negligently, rather than intentionally. According to Ocwen, the Beecroft complaint potentially alleges conduct that neither falls into the enumerated statutes nor "arises out of" conduct that is alleged to violate those statutes.

We evaluate a district court's grant of a motion for judgment on the pleadings *de novo*, viewing "the facts in the complaint in the light most favorable to the nonmoving party." *ProLink Holdings Corp. v. Fed. Ins. Co.*, 688 F.3d 828 (7th Cir. 2012); *Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016). We may affirm "only if it appears beyond doubt that [Ocwen] cannot prove any facts that would support [its]

---

[1] Beecroft's lawsuit was later consolidated with a class action, *Keith Snyder v. Ocwen Loan Serv. LLC*, No. 1:14-cv-8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019). Final judgment (based on an approved settlement) was entered on July 1, 2019.

claim for relief." *Landmark*, 838 F.3d at 824. The parties agree that Illinois law applies.

## III

### A

A purchaser buys insurance to transfer risk onto an entity that is willing to bear it (for a price). Commercial general liability insurance addresses the risk of tort liability: a commercial policyholder—the insured—sleeps easier knowing that if it should be sued in tort, the insurer will pay for its defense and, if need be, indemnify its losses.

An insurer has a duty to defend its insured "unless it is clear from the face of the underlying complaint that the facts alleged do not potentially fall within the policy's coverage." *G.M. Sign, Inc. v. State Farm Fire and Cas. Co.*, 18 N.E.3d 70, 77 (Ill. App. Ct. 2014) . "If *any* portion of the suit potentially falls within the scope of coverage, the insurer is obligated to defend." *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr.*, 566 F.3d 689, 694 (7th Cir. 2009). It is "the factual allegations in the complaint, and not the legal labels a plaintiff uses," that matter. *Id*. at 696. And factual allegations "are only important insofar as they point to a theory of recovery." *Id*. (citing *U.S. Fid. & Guar. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 932 (Ill. 1991) ("[A]n insurer has a duty to defend its insured if *any* theory of recovery alleges potential coverage.")).

When considering whether the facts alleged describe potentially covered liability, Illinois courts "liberally construe[]" the policy terms and the allegations in the complaint in the insured's favor. *Pekin Ins. Co. v. XData Sols., Inc.*, 958 N.E.2d 397, 400 (Ill. App. Ct. 2011). *XData* added that "[t]his is true

even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy." *Id.* Accordingly, a decision to excuse an insurer's duty to defend based on an exclusionary clause in the contract "must be clear and free from doubt." *Evergreen Real Estate Servs., LLC v. Hanover Ins. Co.*, 142 N.E.3d 880, 887 (Ill. App. Ct. 2019). Reasonable disagreement about the applicability of an exclusion must be resolved in favor of the insured. *Id*.

To prevail against Zurich, Ocwen needs to establish that there are factual allegations in the Beecroft complaint that the policy exclusions do not remove from coverage. Even a single covered factual allegation would suffice to trigger Zurich's duty to defend. See *Title Indus. Assurance Co. v. First Am. Title Ins. Co.*, 853 F.3d 876, 887 (7th Cir. 2017).

Some of the language in the Zurich policy is straightforward. For example, injuries resulting from violations of the TCPA, CAN-SPAM Act, and FCRA are not covered—full stop. But there is also a catch-all clause that sweeps in more. The "arising out of" language excludes the underlying *conduct* that forms the basis of the violation of an enumerated law, even if liability for that underlying conduct might exist under a legal theory that is not expressly mentioned in the policy exclusion (*e.g.*, common-law invasion of privacy).

Stated differently, the "arising out of" phrase presents a "but-for" inquiry: if the plaintiff would not have been injured but for the conduct that violated an enumerated law, then the exclusion applies to *all* claims flowing from that underlying conduct regardless of the legal theory used. See *G.M. Sign, Inc.*, 18 N.E.3d at 78 ("'Arising out of' means 'originating

from,' 'having its origin in,' 'growing out of,' and 'flowing from.'").

*G.M. Sign* dealt with an arrangement quite similar to the one before us. In that case, State Farm issued a liability policy that excluded injuries "*arising directly or indirectly out of*" conduct that "violates or is alleged to violate" the TCPA, the CAN-SPAM Act, or any other law that regulates the communication of information. *Id.* at 74. The insured sent unsolicited faxes and was sued for alleged TCPA violations, common-law conversion, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id*. at 73. Because all three counts in the complaint referred only to the factual allegations of faxes that were also alleged to have violated the TCPA, the court held that the common-law conversion claim fell within the policy exclusion. *Id*. at 79; see also *Mesa Labs., Inc. v. Fed. Ins. Co.*, 436 F. Supp. 3d 1092, 1098–99 (N.D. Ill. 2020) ("[Plaintiff's] common law and TCPA counts derive from 'the very same conduct,' namely 'the sending of unsolicited fax advertisements …' triggering the Information Exclusion.").

**B**

With these legal standards in mind, we are ready to turn to Ocwen's three suggested constructions of Beecroft's complaint. Any of these, it argues, allows it to avoid the policy exclusions.

**1**

The TCPA prohibits people from initiating "any telephone call to any residential line using an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(B). It does not address calls that do not use artificial or prerecorded voices directed to residential lines. Ocwen stitches together two components of

Beecroft's complaint to support an argument that it *may* have placed non-prohibited calls to Beecroft's home phone. First, it points to the complaint's description of its collection efforts, which "include[d]" calls to Beecroft's home phone (in addition to cellular calls, letters, and billing statements). Second, it cites the factual allegation in the complaint that Beecroft "answered approximately two calls from Ocwen," and after answering the phone, "there was a significant delay before an operator would come onto the line and ask for" her. If these two sets of phone calls have any overlap, Ocwen argues, they would establish the potential for alleged behavior that does not violate the TCPA. Calls to Beecroft's home landline using a live operator would support her common-law invasion of privacy claim while steering clear of the exclusions.

2

The TCPA also forbids making "any call … using any automatic telephone dialing system [(ATDS)] or an artificial or prerecorded voice" to "any telephone number assigned to … a cellular phone service." 47 U.S.C. § 227(b)(1)(A)(iii). A call to Beecroft's cell phone without using an ATDS or artificial or prerecorded voices would not violate the TCPA.

Ocwen finds this scenario in the complaint by flipping Beecroft's decision to answer two phone calls on its head. Although Beecroft inferred that Ocwen was using an ATDS because of the delay before an operator came on the line, Ocwen argues that this allegation of ATDS usage was "based on an assumption drawn from a limited sample size" of two out of the 58 alleged phone calls. Further, Ocwen declines to read Beecroft's allegation that "some or all of the calls to [her] cell phone … were made using [the five specified ATDS systems]" as foreclosing the possibility that *some* of those calls used *no*

ATDS. Because the conjunction "or" can impose an exclusive choice between "some or all," and because "some" is not "all," Ocwen argues that there might be a residuum of cell phone calls placed with old-fashioned manual dialing, and any such calls did not violate the TCPA.

3

Even if all that were true, though, Ocwen would still have the FDCPA to worry about. Setting aside the live-operator calls to Beecroft's home and the manually dialed calls to her cell phone, and assuming that neither violated the TCPA, it remains true that if Ocwen caused "a telephone to ring … repeatedly or continuously with the intent to annoy, abuse, or harass any person at that called number," it violated the FDCPA. 15 U.S.C. § 1692d(5). The district court reasoned that because "Beecroft pleaded for the calls to stop … the FDCPA [is] applicable as Ocwen's calls were meant to annoy or harass." *Zurich Am. Ins. Co. v. Ocwen Fin. Corp.*, 357 F. Supp. 3d 659, 672 (N.D. Ill. 2018). Ocwen insists that such an inference is erroneous. Beecroft's complaints accuse Ocwen of "intentionally and/or negligently" invading her privacy. Seizing on the word "negligently," Ocwen argues that this means that at least some calls were not made with the requisite intent for an FDCPA violation.

C

In Illinois civil practice, "[t]he pleader must state the facts essential to his cause of action." *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 984 (Ill. 1981). "A pleading which merely paraphrases the law, 'as though ... to say that (the pleader's) case will meet the legal requirements, without stating the facts,' is insufficient." *Id*. While the duty to defend is not dependent on

a complaint's ability to satisfy a jurisdiction's pleading standards, Illinois has harmonized the principles animating its fact-pleading rules with those guiding the duty-to-defend inquiry. When reviewing a complaint to determine whether it alleges covered liability, Illinois courts "give little weight to the legal label that characterizes the underlying allegations." *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 761 N.E.2d 1214, 1221 (Ill. App. Ct. 2001). Even the Federal Rules of Civil Procedure, which use the more liberal notice-pleading standard, require more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Our job is to focus on the pleaded facts, not on the labels attached to those facts. See *Momence Meadows Nursing Ctr.*, 566 F.3d at 696.

Fairly read, Beecroft's complaint does not allege that Ocwen called her *home phone* using a live operator. The best Ocwen can do is to point to Paragraph 17 of the complaint, in which Beecroft states that she answered two phone calls with a live operator on the other end, and link it to the complaint's separate references to calls to her home. But the natural reading of the complaint precludes such a linkage. In the paragraph immediately before Beecroft's description of those two phone calls, she alleges:

> 16. Throughout the months from October 1, 2013, until February 1, 2014, Defendant Ocwen made approximately 58 calls to Plaintiff's cellular telephone using an automatic telephone dialing system in an attempt to collect the alleged balance due on the Loan from Plaintiff. The phone calls are detailed in paragraphs 37–95 of this Complaint. The phone calls violated the Telephone Consumer Protection Act and were an invasion of Plaintiff's privacy.

"The phone calls" identified in the final sentence are the same "phone calls" referenced in the preceding sentence: the 58 calls to her cell phone. Significantly, the complaint contains no other factual allegations of "phone calls" other than those mentioned in paragraphs 37–95. This is the setting against which paragraph 17 must be read. There is no basis for assuming that the "two phone calls from Ocwen" that Beecroft answered (as alleged in paragraph 17) came from a source other than the set of calls addressed in paragraph 16.

Paragraph 17 confirms this interpretation: its point was not to establish that there was a live operator, but that "there was a significant delay before an operator would come onto the line," and "[t]his delay indicated that Ocwen used an automated dialer to call Plaintiff." Automated dialers are relevant only for establishing TCPA liability for calls *made to cellular phones*. Compare 47 U.S.C. § 227(b)(1)(A), with 47 U.S.C. § 227(b)(1)(B). Thus, we decline to read paragraph 17 in tandem with the stray references to calls to Beecroft's home.

Whether Ocwen on one or more occasions did call Beecroft's "home phone" is not pertinent for the TCPA if Beecroft is not complaining about such a (hypothetical) call in her lawsuit. And in our view, a fair reading of the complaint reveals that she is not. Furthermore, it remains true that the complaint contains no factual allegations that would substantiate the existence of calls that Ocwen placed to her home phone.

Ocwen's assertion that the complaint potentially alleges calls made to Beecroft's cell phone without the use of ATDS also goes nowhere. We agree with the point that a sample size of two tells us nothing from a scientific point of view. But the complaint alleges that "some or all" of the calls to Beecroft's

cell phone "were made using" one of four specified ATDS systems or a "similar dialing system that has the requisite capacity pursuant to the TCPA." That signals that Beecroft is complaining about the ATDS calls, not a stray direct call.

While Ocwen's proffered rules of grammatical construction hold true in isolation—no one disputes that "or" is disjunctive and that "some" does not mean "all"— these rules do not override the text taken as a whole. And that text does not say "some *but not all*" of the calls were placed using an ATDS system. It says that "some *or all* of the calls to Plaintiff's cell phone, *including but not limited to the [58] calls listed above*," (our emphasis.) were made using the specified ATDS systems. If the word "some" stood alone (without the "or all"), it would still expressly "includ[e]" all 58 calls made to Beecroft's cell phone. "Some," in this context, cannot be read impliedly to omit calls in the group that it specifically purports to classify.

More likely, the word "some" plays a distributive role in relation to the specified ATDS systems Ocwen was using. "Some" of the calls were placed using Global Dialer, "some" were placed using IAT Predictive Dialer, "some" were placed using a Davox Dialer, "some" using Aspect Dialer, and the rest used "a similar dialing system … ." It is also possible that Ocwen used only two or three of those systems. Either way, the reference to "some" calls serves only to distribute the group of 58 among the five options.

Finally, even if there were calls to Beecroft's home or cell phone that did not violate the TCPA, Ocwen must still deal with the FDCPA. Because the FDCPA requires an intent to annoy, abuse, or harass, Ocwen seeks refuge in Beecroft's vague references to negligent conduct in Count V, where she

says that Ocwen "intentionally and/or negligently" invaded her privacy by calling her repeatedly. But these are precisely the types of "legal labels" that Illinois courts refuse to credit without factual elaboration. See *G.M. Sign,* 18 N.E.3d at 79 (where a complaint is "so bereft of factual allegations" and is so vague that "myriad unpleaded scenarios could fall within its scope," it cannot trigger a duty to defend).

Count V expressly incorporates by reference the 58 calls to Beecroft's cell phone (and potential calls to her home). It was from this set of calls that the district court inferred Ocwen's intent to "annoy or harass" when it continued to call Beecroft after she asked it to stop. "[T]here is no bright line rule for how many calls are sufficient to support an inference of an intent to harass, oppress or abuse." *Holliday v. Virtuoso Sourcing Grp., LLC*, No. 11-CV-314-JPG-PMF, 2011 WL 5375062, at *2 (S.D. Ill. Nov. 4, 2011). The inference depends on the circumstances. *Id*. Several district courts have found the requisite intent when the caller continues to call after being requested to stop. See *Light v. Seterus, Inc.*, 337 F. Supp. 3d 1210 (S.D. Fla. 2018); *Masuda v. Citibank, N.A.*, 38 F. Supp. 3d 1130 (N.D. Cal. 2014); *Holliday*, 2011 WL 5375062, at *2; *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1227 (E.D. Cal. 2010) (discussing *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507 (9th Cir. 1994)) ("[A]a debt collector may harass a debtor by continuing to call the debtor after the debtor has requested that the debt collector cease and desist communication."); *Chiverton v. Fed. Fin. Grp., Inc.*, 399 F. Supp. 2d 96, 104 (D. Conn. 2005). The district court did not err in drawing a similar inference from Ocwen's persistence in the face of Beecroft's requests that they stop calling her.

**IV**

Because Zurich had no duty to defend based on the factual allegations in Beecroft's complaint, we AFFIRM the district court's judgment.